IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 21-cr-30003-DWD |
| ANTHONY DOBBINS, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION TO EXCLUDE THE GOVERNMENT'S PROPOSED EXPERT
TESTIMONY REGARDING HISTORICAL CELL SITE INFORMATION AND
ANY TESTIMONY OR EVIDENCE REGARDING INFORMATION PRODUCED
BY THE CELLEBRITE UFED TOOL**

COMES NOW Defendant Anthony Dobbins, by and through his undersigned counsel and hereby moves to exclude both the Government's proposed expert testimony regarding historical cell site information and any testimony regarding cellphone extractions produced by the Cellebrite UFED tool because the Government cannot established the reliability of either class of proposed testimony and evidence.

I.      INTRODUCTION

Pursuant to Federal Rule of Evidence 702, the Court acts as a gatekeeper for expert testimony to ensure that it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993); *United States v. Hill,* 818 F.3d 289, 296 (7th Cir. 2016).

Before admitting proffered expert testimony, the Court must conclude not only that such testimony is reliable, but also that it "fits" the facts of the case and will thereby assist

1

the jury in understanding the evidence or some factual issue in dispute. *See Daubert*, 509 U.S. 591; Fed. R. Evid. 702. This fit requirement is "akin to the relevance requirements of Rule 401, which is applicable to all proffered evidence, but goes beyond mere relevance because it also requires expert testimony to have a valid connection to a pertinent inquiry." Weinstein, J. & Berger, M., 4 Weinstein's Federal Evidence § 702.03[1]. As the Supreme Court put simply " [e]xpert testimony which does not relate to an issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.

In addition, expert testimony must also satisfy Rule 403 and may be excluded if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. As the Supreme Court noted in *Daubert*:

> Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Judge Weinstein has explained: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." Weinstein, 138 F.R.D. at 632.

509 U.S. at 595, *quoting* Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence Is Sound: It Should Not Be Amended, 138 F.R.D. 631, 631-632 (1991). *Quoted by United States v. Hill, supra*, 818 F.3d at 296.

II.    THE TESTIMONY OF THE GOVERNMENT'S HISTORICAL CELL SITE
       EXPERT, GREG A. CATEY, SHOULD BE EXCLUDED.

       The Government's expert disclosure states that it plans to call Greg A. Catey, an FBI

Special Agent, to testify that "cell phones used by the defendants and their coconspirators

were present in the vicinity of certain significant locations where crimes alleged in the

indictment occurred." Gov't Expert Notice, Ex A at p. 1. The Government has provided a

single page report followed by maps that will supposedly form the basis of the testimony of

SA Catey as pertains to a phone it alleges is associated with Anthony Dobbins. Ex. B. The

presentation, on Page 2, contains the following explanation as to the subject of his proposed

testimony:

> **1.    Background**
>
> The Federal Bureau of Investigation (FBI)
> Cellular Analysis Survey Team (CAST) was
> requested on 08/04/2020 by FBI-SI to  analyze
> cell phone records for the following numbers:
>
>  (followed by list of 4 numbers).
>
> The records were reviewed as it (sic) related to an
> event which occurred on the following date and
> time:
>
> •      05/18/2018 11:35 PM CDT
>
> **2.    Methodology**
>
> An analysis was performed on the cellular records
> obtained for the numbers.  The cellular records
> documented the network interaction to and from
> the devices. Additionally, the records documented
> the cell tower and cell sector ("cell site") which
> served the devices during this activity.  Used in

conjunction, the cellular records and a list of cell site locations illustrate an approximate location of the devices when they initiated contact with the network.

### 2.1.    Cell Site Locations

Cell sites in existence during the time of the incident were input into mapping software using latitude/longitude coordinates of the cell sites provided by the service provider. The cell sites associated with the target cell phones were located utilizing the mapping software and the plotted cell site data.

### 3.    Conclusions

A historical cell site analysis was performed on the cellular records for the devices. The methods detailed in Sections 2 and 2.1 were used to produce the attached historical cell site analysis maps.

The constructive presumption of either the Government's disclosure or SA Catey's presentation is that the Government intends to offer SA Catey's expert testimony about cell site information as a means to prove that Mr. Dobbins was in the general vicinity of specific locations at various times relevant to the Government's case. To the extent that presumption is correct, SA Catey's expert testimony and opinion must be precluded at trial.

A.    *The Government Cannot Meet its Burden of Proving the Expert's Conclusions Are Reliable.*

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert may testify in the form of an opinion when

(1) the expert's scientific, technical, or other

4

> specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court held that Rule 702 requires the trial judge to assume the role of "gatekeeper" with the task of ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. This Court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue." *Id.* at 592–93.

To guide the assessment of the reliability of an expert's methodology, the Supreme Court has set out several factors to consider. including:

> (i) whether the theory is based on scientific or other specialized knowledge that has been or can be tested;
>
> (ii) whether the theory has been subjected to peer review;
>
> (iii) the known or potential rate of error and the existence of standards controlling the theory's operation; and
>
> (iv) the extent to which the theory is generally accepted in the relevant community.

*Id.* at 593–94. *See United States v. Hill*, 818 F.3d at 295-299.

However, the *Daubert* factors are "meant to be helpful, not definitive," and the trial court retains the discretion to determine how to evaluate an expert's reliability on a case-by-case basis. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151–52 (1999) (extending *Daubert*'s holding on scientific expert testimony to all expert testimony). The principal consideration is whether the evidence is sufficiently reliable for presentation to the jury through expert testimony.    The proponent of the testimony bears the burden of proving that the proffered testimony meets these requirements. *See United States v. Saunders*, 826 F.3d 363, 368-369 (7th Cir. 2016).

Over the past decade, law enforcement's use of historical cell site location analysis has come under increasing scrutiny by courts, scholars, and commentators. *See, e.g.*, *United States v. Hill*, 818 F.3d 289, 299 (7th Cir. 2016) (cautioning the Government "not to present historical cell-site evidence without clearly indicating the level of precision—or imprecision—with which that particular evidence pinpoints a person's location at a given time.")[1] This is because, although courts have generally admitted expert testimony relating

---

[1] *See also, United States v. Reynolds*, 626 F. App'x 610, 618 (6th Cir. 2015) (finding no abuse of discretion in admitting historical cell site analysis where agent's "technique thereby avoided the disputed assumption that each call connected to the nearest tower or originated from within a specific cell sector"); *United States v. Nieves*, 2021 U.S. Dist. LEXIS 74763; *United States v. Evans*, 892 F. Supp. 2d 949, 956 (N.D. Ill. 2012) (rejecting agent's novel and "wholly untested" theory of granulization, which he claimed allowed prediction of coverage overlap of two closely positioned towers, but admitting traditional historical cell site analysis); Victoria Saxe, Note, *Junk Evidence: A Call to Scrutinize Historical Cell Site Location Evidence*, 19 U.N.H. L. Rev. 133 (2020); Thomas J. Kirkham, Note, *Rejecting Historical Cell Site Location Information as Unreliable Under Daubert and Rule 702*, 50 U. Tol. L. Rev. 361, 381 (2019); Paul W. Grimm, *Admissibility of Historical Cell Phone Location Evidence*, 44 No. 4 Litigation 53, 56 (2018); John B. Minor, *Forensic Cell Site Analysis: A Validation & Error Mitigation Methodology*, 12 J. Digit. Forensics, Security, & L. 33 (2017); Tom Jackman, *Experts say law enforcement's use of cellphone*

to historical cell site location analysis, the accuracy and reliability of the methodology have not been scientifically verified. *See generally* Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 Rich. J.L. & Tech. 3 (2011); *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) ("[E]xpert testimony long assumed reliable before Rule 702 must nonetheless be subject to the careful examination that *Daubert* and *Kumho Tire* require.").

As set out below, the Government has failed to meet its burden with respect to the proposed expert testimony. The myriad unknowns about historical cell site location information include: whether the underlying data is itself accurate; what external factors affect the signal strength of the surrounding cell sites; the precise coverage range of the relevant towers at the time; and how often a cellphone does not connect to the closest tower. Because these unknowns substantially undermine the reliability of the proposed analysis, it cannot and should not be admitted at trial.

1. *Historical cell site analysis is based on untested assumptions and techniques*.

By way of background, cellphones send and receive radio signals between phones' internal antennas and cell towers, also known as cell sites. *See* Larry E. Daniel & Lars E. Daniel, *Digital Forensic For Legal Professionals: Understanding Digital Evidence From*

_____

*records can be inaccurate*, Wash. Post (June 27, 2014) ("The use of cellphone records to place suspects at or near crime scenes is coming under attack in courts nationwide, challenging an established practice by federal and local law enforcement that has helped lead to thousands of convictions."); Douglass Starr, *What Your Cell Phone Can't Tell the Police*, New Yorker (June 26, 2014) ("[Y]ears of prosecutions and plea bargains have been based on a misunderstanding of how cell networks operate.").

*The Warrant To The Courtroom* 229–30 (R. Maxwell & S. Spielman eds., 2012). Cell towers are designed to cover certain geographic areas, but the coverage area varies, and the range can be affected by external factors—for instance, during an influx of users into the coverage area, the range may decrease to accommodate the increase. *Id*. at 226, 233. Cell tower coverage areas are designed to overlap to optimize coverage and ensure smooth handoffs between coverage areas. Accordingly, a cellphone is usually within the coverage area of multiple cell towers. *Id*. at 229–30.

"It is a common misconception that a cellphone connects to the cell tower physically closest to it when registering to a cellular network." Saxe, *supra*, at 139; *see also* Blank, *supra*, at 3, 6, 16. Cellular networks are designed to connect a phone receiving or sending a call or text to the tower with the strongest signal. Daniel & Daniel, *supra*, at 229–30. Though proximity to the cell tower is important, a host of factors affect the signal strength, such as the number of available cell towers, topography, weather, population density and the technical characteristics of the cell tower. Blank, *supra*, at 6.

When a cellphone sends or receives a text message or phone call and connects with a cell tower, the registration is processed by the carrier, and the carrier records the information for customer billing purposes. Daniel & Daniel, *supra* at 163, 225. This information is maintained purely for billing purposes; historical cell site information, unlike GPS, was not designed to track a user's location. *See* Kirkham, *supra*, at 377.

When a party requests information for a particular phone number from the carrier, the information is produced in call detail records (CDRs), which typically show the date and time

8

of the call, the duration of the call, the calling number, the called number, the carrier

identifier, the billable time of the call, and the tower locations that connected to the call

(either one cell site location if there was no handoff or two cell site locations tracking the

beginning and end of the call).

Typical analysis of historical cell site data assumes the carriers' underlying CDR data

is 100% accurate. This is incorrect. It is also known that CDR records are sometimes "lost,"

meaning "the CDR(s) could not be placed into the destination file due to irrecoverable

errors." John B. Minor, *Forensic Cell Site Analysis: Mobile Network Operator Evidence*

*Integrity Maintenance Research*, 14 J. Digit. Forensics, Security & L. 59, 69 (2019). Cell

carriers, however, do not provide any information on when or how often the "lost CDR

indicator" is applied or when cell tower information is inaccurate. *See id.* at 169.

It is also erroneous to assume that cell tower location data is always accurate. Indeed,

according to the only peer-reviewed study of which the defense is aware assessing the error

rate relating to historical cell site location analysis, carrier records "erroneously identified

more than 20 cell site locations within a radius of 2 miles." Minor, A Validation & Error

Mitigation Methodology, *supra*, at 35. A review by the Denmark National Police uncovered

significant errors in carrier cell tower location records:

> [T]he telecom providers' mast lists have not been
> correct and continuously updated, and [ ] there
> have therefore been errors in the
> telecommunications providers' historical lists of
> the telemasters' locations. It could be, for
> example, because a telecommunications company
> has set up temporary masts due to repairs [of]
> existing masts, or because there is a festival in an

9

> area and that therefore needs extra masts as there
> are more people gathered in one place.

Louise Dalsgaard & Emma Toft, *Understand the Mistakes in the Telecommunications Scandal: Telephone was in Copenhagen and Frederikshavn at the Same Time*, Danish Broad. Corp. (Aug. 31, 2019), https://www.dr.dk/nyheder/indland/forstaa-fejlene-i-teleskandalen-telefon-var-i-koebenhavn-og-frederikshavn-paa-samme.

Third, historical cell site analysis generally makes faulty assumptions about coverage area. Carriers' CDR and tower data provide no information about the strength of a given tower's signal. To test the range of a cell tower, carriers conduct forensic radio surveys, or "drive" tests, in which an engineer drives through the area while operating mobile receiver equipment to measure the signal strength in the area. *See* Saxe, *supra*, at 144. There is no indication in the Government's notice whether this type of drive test was conducted here. In any event, "given all the factors that affect signal strength and the unlikelihood that the weather and cellular network conditions during the test drive are identical to those when the cellular activity actually occurred, the reliability of this methodology is disputed." *Id.*; Erin Murphy, *The New Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence*, 95 Cal. L. Rev. 721, 772–73 (2007) ("[V]erifying that a cell-site report obviously difficult to scrutinize.").

Finally, the fundamental assumption underlying historical cell site analysis is that cellphones generally connect to the cell tower that is closest to the phone. *See Reynolds*, 626 F. App'x at 618 (noting that "[t]he 'one-location' tracking approach assumes that the cellphone connected to the closest tower because that tower is most likely to produce the

strongest signal" and finding that the district court did not abuse its discretion in allowing that testimony because the agent's process "avoided the disputed assumption that each call connected to the nearest tower"). What little data there is disproves the assumption in a significant number of cases, especially in urban areas, with their high density of both buildings and cellphone users. *See also* Jackman, *supra* ("There are so many different factors [involved] that two cellular devices stationed next to each other making phone calls at the same moment could still get different towers . . . . I've seen proof that two individuals, subscribed to the same cellular provider, standing next to each other—on surveillance—can still get different towers." (quoting Jeff Fischbach, forensic expert)).

Topography, geography, weather, population density, and cell tower outages often impact signal strength. In one study, after taking steps to account for these factors, the final map of the coverage area was modified in approximately 40% of the cases and "in 6% of the cases, use of the validation and error mitigation process resulted in a modified final mapping analysis that impacted the outcome of the case in terms of the verdict of guilt or innocence in criminal cases or damages awarded in civil litigation." Minor, A Validation & Error Mitigation Methodology, *supra*, at 45–46.

At best, historical cell site analysis can sometimes show that an individual is within one to five kilometers of a cell tower (if it is a small macro cell), as well as where an individual likely was not. *See Reynolds*, 626 F. App'x at 618 (finding no abuse of discretion in admitting historical cell site analysis because agent concluded that "the cell-site data did not show that [defendant] was absent from the home" and "[i]mportantly, [the agent]

declined to draw a conclusion about [defendant's] location on the basis of cell-site data alone"); *see also* Br. for the United States-Appellee, *Carpenter v. United States*, 138 S. Ct. 2206, at 11, 24 (2018) (the Government argued that "[i]nferences about location drawn from cell site information are far less precise than GPS data and do not permit a detailed reconstruction of a person's movements" and noting that historical cell site analysis was "as much as 12,500 times less accurate than GPS data").

Other federal agencies have recognized the dangers in relying on cell tower evidence as a proxy for location. Indeed, the Federal Communications Commission changed its 911 regulations from determining location based on cell site data to using GPS data. *See* Michael Cherry et al., *Cell Tower Junk Science*, 95 Judicature 151 (2012). This is because, when the 911 system relied on the location of the cell tower to which an emergency caller pinged, responders often went to the wrong place, in some instances arriving at some location miles away from the caller's actual location. *See* Saxe, *supra*, at 149–50; Location-Based Routing for Wireless 911 Calls, 33 FCC Rcd. 3238, 1 (Mar. 23, 2018). In one instance, responders were routed to Philadelphia, Pennsylvania after a woman suffered a head trauma in Burlington County, New Jersey, twenty to thirty minutes away from Philadelphia. *See* Kirkham, *supra*, 50 U. Tol. L. Rev. at 381.

As one commentator has explained, "[a] methodology that has been determined by independent government agencies not to be able to stake a caller's life on should not now be accepted as reliable enough to risk a defendant's liberty." Cherry et al., *supra*, at 152. Historical cell-site evidence is not sufficiently reliable to be admitted against a defendant in

a criminal trial.

    2. *Historical cell site analysis has not been subject to peer review or publication.*

To our knowledge, there has only been one peer-reviewed study about the validity of historical cell site mapping as used by law enforcement. *See United States v. Allums*, No. 08 Cr. 30 (TS), 2009 WL 806748, at *2 (D. Utah Mar. 24, 2009) (explaining that the analyst was unable to "identify any peer-review process that the methodology has undergone, nor the rates of error"). As detailed above, this study looked at factors, such as weather and topography, that can affect a site's signal strength. *See* Minor, A Validation & Error Mitigation Methodology, *supra* (published in the peer-reviewed Journal of Digital Forensics, Security and Law). Based on a review of approximately 100 criminal and civil cases in which an analyst created mapping exhibits, the study concluded: (1) there were validation and error mitigation techniques that analysts could take to improve the accuracy of historical cell tower mapping; (2) only 11% of analysts attempted to validate the geographic locations of cell sites, 7% conducted drive tests to estimate signal strength, and the remaining analysts conducted no validation techniques; and (3) "[u]se of the methodology in the same group of criminal and civil cases resulted in a modified final mapping analysis in approximately 40% of the cases" and impacted the final outcome of the case in 6% of the cases. *Id*. at 35–46.

    3. *Historical cell site analysis has no known error rate.*

Further, there is no known error rate of historical cell site analysis to meet the third *Daubert* factor. *See* 509 U.S. at 593–94. Absent an error rate, a court cannot determine whether an expert's experiences constitute meaningful expertise.

It is unknown how often law enforcement analysts produce an incorrect final mapping analysis. With respect to CDRs and cell tower location information, there is likely an ascertainable error rate, but it has not yet been estimated. Cell carriers do not provide any information on when or how often cell tower information is inaccurate. *See* Minor, Mobile Network Operator Evidence, *supra*, at 169. We are aware of no efforts by analysts to make even a general calculation about the error rates for these underlying records. There has also been no attempt to calculate the error rate for analysts' estimates about the coverage range of cell sites. *See* Jackman, *supra* (according to one forensic analyst, it is impossible "for anyone to reliably determine the particular coverage area of a cell-tower antenna *after the fact* based solely on historical cell-tower location data or call-detail records" (emphasis added)); *see also id.* (another expert explaining that "[w]e have never seen courtroom evidence . . . that authenticates an antenna's range").

There is also no known "error rate" for the fundamental assumption that cellphones generally connect to the closest tower. It is not even properly an "error" when a cellphone does not connect to the closest tower because that is a normal part of how cellular networks are designed to work.

Because there is no known error rate in this field, it is impossible to guess how often SA Catey's conclusions are correct, rendering his opinions unreliable. For this reason, he should be excluded as an expert.

4. *Historical cell site analysis is not generally accepted by the relevant scientific community.*

Although courts have permitted the Government's introduction of expert cell site

14

testimony, historical cell site analysis has not been generally accepted by the relevant scientific community. Courts that credited the methodology "relied primarily on other federal courts' acceptance of historical cell-site tracking to conclude that the technique is reliable." *Reynolds*, 626 F. App'x at 616. Such reliance, however, is circular and should be avoided. *See United States v. Hill*, *supra*, at 297 ("[J]udicial acceptance is not relevant; what matters is the general acceptance in the relevant *expert* (scientific or otherwise) community").

*United States v. Schaffer*, one of the original cases finding that historical cell site analysis was reliable (without appearing to apply the *Daubert* factors), found it persuasive that the "FBI had been successful at least 1000 times." 439 F. App'x 344, 347 (5th Cir. 2011); *see also Allums*, 2009 WL 806748, at *2 ("The methodology . . . has general acceptance in the area of law enforcement."). But it remains unclear what the court meant by "successful." *See Reynolds*, 626 F. App'x at 616 (referring to the claim relied upon in *Schaffer* and finding that "[t]his claim appears to be precisely the sort of '*ipse dixit* of the expert' testimony that should raise a gatekeeper's suspicion"). Without knowing the import of the FBI's "success" rate, this claim is meaningless.

> B.    *The Government's Proffered Historical Cell Site Evidence Should Be Excluded as Irrelevant, Or, in the Alternative, Because it Is More Prejudicial than Probative.*

The Government's cell site evidence fails to satisfy the threshold of relevance. Because a cell phone does not necessarily connect to the nearest tower with any scientific level of accuracy or reliability, evidence that a particular cell phone connected with a particular tower makes no "fact that is of consequence to the determination of the action

more probable or less probable" and therefore fails to satisfy the threshold relevance inquiry and should not be submitted to the jury for its consideration. Fed. R. Evid. 401 ("[r]elevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of action more probable or less probable than it would be without the evidence"); *see also Daubert*, 509 U.S. at 591 ("Rule 702 further requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue. This condition goes primarily to relevance."); *United States v. Hill, supra*, 818 F.3d at 296 ("When evaluating whether an expert's testimony should be admitted, a court must consider whether the expert's testimony is 'supported by appropriate validation' and 'will assist the trier of fact to understand or determine a fact in issue.'"), quoting *Daubert*.

Additionally, the Court should exclude an expert's testimony under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Expert testimony risks violating Rule 403 because it can be powerful and misleading, and thus difficult to evaluate. *See Daubert,* 509 U.S. at 595. *See, e.g.*, *United States v. Nieves*, No. 19 Cr. 354 (JSR), 2021 WL 1535338, at *1 (S.D.N.Y. Apr. 18, 2021) (excluding testimony from cell site analyst under Rule 403).

III.    THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM OFFERING INTO EVIDENCE DATA EXTRACTED FROM MR. DOBBINS' CELLPHONE, AND TESTIMONY RELYING ON THAT DATA, SINCE IT CANNOT ESTABLISH THAT THE CELLEBRITE UFED EXTRAPOLATION TOOL IS RELIABLE.

The Government has provided in discovery a so-called extrapolation report of a

cellphone seized from Mr. Dobbins. The report was created using the Cellebrite UFED extrapolation and anlysis tool. What has not been provided is the identification of experts whom it would call to testify as to the reliability of the "Cellebrite" device.[2]

A "Cellebrite" device is a machine produced by third-party company Cellebrite Mobile Synchronization, Ltd., an Israeli digital intelligence company. Cellebrite advertises itself as "enabl[ing] investigators to capture insights in today's complex, digital world" by "provid[ing] a complete and objective picture of evidence, empowering agencies and investigators to solve and close cases faster than ever." *See, e.g.*, https://www.cellebrite.com/en/about/. The Cellebrite devices are connected to another electronic device via a cord. The Cellebrite device then purports to create a copy of the subject device (even if it has been "locked" by the user), transferring the information to a disc or other medium.

Courts appear to frequently allow testimony regarding the *results* of a Cellebrite "copy," but have not analyzed the reliability of the purported copy in the first instance. This concern was raised in a concurring and dissenting opinion in *United States v. McLeod*, 755 F. App'x 670 (9th Cir. 2019). There (as proposed here) an agent testified about how he used a Cellebrite device during the course of an investigation to obtain information from a cell phone. *Id.* at 673. The court allowed the testimony to proceed as lay testimony, but did not analyze the underlying technology in the first place. In a dissent, District Judge Molloy of the

---

[2]The "results" from these Cellebrite extractions are voluminous and not likely to aid the Court's decisional process. However, such results are available upon request.

District of Montana, sitting by designation, noted this incongruity: "simply because the user
can follow prompts from the program does not mean that expert testimony is not required or
that the underlying technology is reliable." *Id.* at 676. Indeed, Judge Molloy pointed out the
defendant had been able to demonstrate that Cellebrite devices are not infallible and in fact
can "produce significant errors, including not acquiring files and misreporting data." *Id.*

Here, the Government has failed to identify as an expert the person or persons who
purport to be able to explain how the system functions and establish the reliability of the
underlying technology. Testimony by someone who plugged a phone into a device and
pushed the start button does not explain what the device is *doing*, what its *error rate is*, and
whether the results can meet the *Daubert* standard for *reliability*.

There is good reason for skepticism since Cellebrite sells its products almost
exclusively to government entities, and does not answer questions or reveal its processes to
the general public, explaining instead that its technology is "proprietary."[3] There are further
no independent national or (even international) standards governing Cellebrite, which means
that Cellebrite is essentially unmonitored and unaccountable. If the Government intends to
introduce into evidence the end product of Cellebrite's technology, it may not shield the
methods and processes of that technology from scrutiny under *Daubert*. The Government

---

[3]For example, if one travels to Cellebrite's website and attempts to purchase a UFED
Premium device, one is immediately pressed for personal information along with the
"Agency/Organization/Company" requesting the information. Cellebrite further warns
"Purchasing UFED Premium is conditional upon agency vetting and Cellebrite regulations,"
whatever those are. What are the acceptable industries to Cellebrite? There are only two
options on the order form: "Law Enforcement" and "Military/Intelligence." *See*
https://www.cellebrite.com/en/ufed-premium/#form.

must establish the reliability of its underlying technology before its witnesses should be permitted to testify regarding the data allegedly  uncovered by the Cellebrite program.

IV.    <u>CONCLUSION</u>

For the reasons set forth herein, and for any that are apparent at a subsequent hearing or oral argument, the Court should conclude that the Government's proffered historical cell site evidence is inadmissible. In the alternative, the Court should hold a *Daubert* hearing at which the Government must establish the admissibility of this evidence. Furthermore, the Court should preclude the Government from offering the Cellebrite extrapolation reports or information derived from those reports unless it establishes the reliability of the Cellebrite tool at a *Daubert* hearing.

Respectfully submitted,

LUPITA THOMPSON
THOMPSON LAW, LLC
125 East Jefferson Avenue
P.O. Box1388
Effingham, Illinois 62401
(217) 347-5291
(217) 347-5282 (fax)
lupita@thompsonlawllc.legal
Attorney for Anthony Dobbins

JEAN D. BARRETT, ESQUIRE
RUHNKE & BARRETT
47 Park Street
Montclair, New Jersey 07042
973-744-1000
973-746-1490 (fax)
jeanbarrett@ruhnkeandbarrett.com
Attorney for Anthony Dobbins

By:    */s/ Jean D. Barrett*
        JEAN D. BARRETT, ESQUIRE
        Attorney for Anthony Dobbins

<u>Dated</u>:        August 15, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2022, this Motion to Join has been electronically filed using the CM/ECF filing system and that a true copy of this Motion will be electronically served upon the Government and all parties.

By:    */s/ Jean D. Barrett*
<u></u>
JEAN D. BARRETT, ESQUIRE
Attorney for ANTHONY DOBBINS

C:\CASE FILES\TRIAL_FILES\CASES PENDING TRIAL\Dobbins, Anthony[C]\Motions\Cell site testimony\Motion.wpd