IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | |
| v. | ) | No. 21-cr-30003 |
| | ) | East St. Louis, Illinois |
| FRANK SMITH, ET AL, Defendants. | ) | DAUBERT HEARING |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DAVID W. DUGAN

DECEMBER 9, 2022

APPEARANCES:

FOR THE PLAINTIFF: MR. ALEXANDER BYRNE GOTTFRIED
MR. JEREMY I. FRANKER

FOR THE DEFENDANT: MS. LUPITA THOMPSON
MS. JEAN D. BARRETT
MR. DAVID A. BRUNS
MS. KIM FRETER

Erikia Schuster, RPR
750 Missouri Avenue
East St. Louis, IL 62201
618-482-9226
Erikia_Schuster@ilsd.uscourts.gov

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

COURTROOM DEPUTY: We are now on the record in case number 21-CR-30003, United States of America versus Warren Griffin and Anthony Dobbins for a Daubert hearing. Will the parties please identify themselves for the record.

MR. FRANKER: Good morning, your Honor. Jeremy Franker and Alexander Gottfried on behalf of the United States.

THE COURT: Good morning.

MS. FRETER: Kim Freter for Mr. Griffin.

THE COURT: Good morning.

MR. BRUNS: David Bruns for Mr. Griffin.

THE COURT: Good morning.

MS. BARRETT: Jean Barrett for Mr. Dobbins.

THE COURT: Good morning.

MS. THOMPSON: Good morning, your Honor. Lupita Thompson on behalf of Mr. Dobbins.

THE COURT: Good morning. I think we have everyone here except for Mr. Griffin, but I have learned that Marion County is apparently bringing him down to the place where they have the video set up. So I'd thought we'd go ahead and get started so we don't keep everybody all day. Do you have any problem with that, Ms. Freter, that we proceed just with the preliminary matters until your client gets on?

MS. FRETER: We have no objection, your Honor. I believe the courtroom deputy can just pop him in when he gets

here.

THE COURT: I appreciate that. Thank you.

So we have two motions today. Apparently, Mr. Dobbins filed a motion to exclude the Government's expert testimony regarding historical cell site information and testimony produced by the Cellebrite tool, that's Document 398. And then Mr. Griffin filed a very similar motion, and that's Document 400. And I thought what we would do, and I think it would be helpful, if we could have the parties do somewhat of an opening statement or at least an outline of what the issues are because of some complications associated with this. That would be helpful to the Court at least if you could do that. I know typically this is the burden of the Government in large part. Would you have any problem, Mr. Franker, if I let Ms. Barrett or Ms. Thompson kind of outline the basis for their motion and we'll go in that direction?

MR. FRANKER: No, your Honor.

THE COURT: Okay. Very good. Ms. Barrett or Ms. Thompson?

MS. BARRETT: Yes, sir. I believe this is mine going forward here. Your Honor, the motion that -- first of all, the first portion of the motion challenges the cell site location testimony. In addition to that, the presentation, PowerPoint presentation that the Government has disclosed to

the parties. The basis for that is that there is simply nothing about this presentation which would pass muster under Daubert. The information in the presentation includes information about cell site sector coverage and range, and it is -- and it includes illustrations.

I believe Mr. Griffin is about to arrive. There he is.

THE COURT: I see that. Thank you. Mr. Griffin, welcome. Is there any way we can mute him for the time being? Dana, is that something you can do? All right. Good. Ms. Barrett.

MS. BARRETT: Yes, your Honor. We believe that this testimony does not meet the criteria of Daubert in Rule 702. It is not based on any scientific theory. It is not capable of being peer reviewed. There's no known error rate and there's no general acceptance in the scientific community. And the reason of all that is because it relies on records that are maintained by the telephone company for the purposes -- for different purposes, not for location. The records were never intended to be used for this purpose. The Government does not have any way to show the accuracy of the telephone records, and they don't qualify as business records for this purpose primarily because of the telephone companies don't maintain these records for this very purpose.

So it's our position, your Honor, that the cell site

test -- the limitations of this testimony means that very little of the maps should be able to be produced in Court. Certainly the sort of vector symbols and the shaded portions of the map should not be able to be produced and because there is no way of verifying, even for the Government to verify, the accuracy of the information about the cell sites that are contained in the -- in the records maintained by the phone company, we believe that this is not supported and should not be admitted.

THE COURT: Very good. Ms. Thompson, are you going to add anything?

MS. THOMPSON: Can you hear me, your Honor?

THE COURT: I can.

MS. THOMPSON: No, I'm not. Ms. Barrett is handling this motion today. Thank you.

THE COURT: All right. Very good. Mr. Franker?

MR. FRANKER: Thank you, your Honor. We laid out our position in our briefing as well as at the oral arguments that were a couple of weeks ago. For the Daubert hearing this morning, what we've done is we have Special Agent Greg Katey available to testify as a witness. My understanding based on the motions as well as the oral arguments and what Ms. Barrett just stated, that a majority of her objections go not specifically to this witness, but to this kind of testimony generally and also to the specifics about the PowerPoint that

has been provided in discovery. The Government will list as an exhibit for purposes of trial, and we have that listed as a Government exhibit for purposes of this hearing this morning, and Ms. Barrett attached it as an exhibit to her original motion. I believe it was attached as Exhibit B.

So the Government's plan this morning was to call Special Agent Katey as a witness, go briefly through his background, his prior history and the Cellular Analyst Survey Team, or CAST, with the FBI, talk generally about the historical cell site analysis, the analysis that is at issue here, and then go specifically to the PowerPoint presentation which is a Government exhibit. I believe the technology will allow me to share the screen while Special Agent Katey is testifying, and I think he can address some of the concerns that Ms. Barrett has raised about shading, sectors and those kind of things. So that's the way that the Government plans to proceed this morning if that's in line with what the Court was anticipating. We have Special Agent Katey in the waiting room and we are ready to call him as a witness.

THE COURT: Is he going to speak to any expertise regarding the Cellebrite?

MR. FRANKER: He is not, your Honor. All though they were filed as part of the same motion they're really separate issues. My understanding based on the court orders is that we were here this morning to do the cell site analysis portion of

Ms. Barrett's motion. I know the Court asked for additional briefing on the specific cases that related to Cellebrite. I apologize if I missed something, but I didn't see anything that was related to that for today. I don't have a Cellebrite witness today. The Government's position was that a Daubert hearing was unnecessary on that specific issue. All though, again, they are filed on the same motion they're really very distinct and separate things. The Cellebrite has to do with the download from the phone itself; whereas the historical cell site analysis is done by reviewing the records that are provided from the phone company and not the data from the phone itself.

THE COURT: I understand that. I do see them as separate distinct issues, very much so. I agree with that. I wasn't really clear on what Ms. Barrett was planning on arguing regarding the Cellebrite issue. That's part of the reason we had you brief on the Wehrle case out of the Seventh Circuit. I assume that something was going to be presented in that regard. I think both of you indicated there was no application, but I was looking at Justice St. Eve's concurrence, and that is really the reason we wanted your input on this. I know it's a concurrence, but nevertheless it may be a bit of a marker on what the Seventh may do on issues like this. That was part of the reason we asked you to provide some of your thoughts on that. It didn't seem like

either side really spent much time on that issue. Ms. Barrett, what was your understanding? Were you expecting something more in the Cellebrite issue this morning?

MS. BARRETT: Yes, your Honor. In regard to the Cellebrite issue, it's my understanding that the Government's position is that it's not expert testimony. I think the Wehrle case makes it very clear that it is and that it should be subject to challenge in terms of -- which the Government has not addressed in terms of the reliability of the program, how it operates and what in the end -- the end product is with regard to Cellebrite. These programs are proprietary. They're not tested. They're not peer reviewed and it is our position that because of that they should not be -- they should not be able to be offered into evidence in this case.

THE COURT: Okay. My understanding is the Government is definitely not trying to propose Mr. Katey as an expert on the Cellebrite and how the information is transferred or anything with regard to the technical side of that. My understanding is he was going to testify just simply as to the cell tower issue. And then as to -- you'll have somebody, I assume, testify, Mr. Franker, or try to testify regarding the fact that a download occurred and what was found. Am I assessing that correctly, Mr. Franker?

MR. FRANKER: Special Agent Katey will not testify. He had no involvement with Cellebrite in this case. The work

that he did on this case doesn't have anything to do with downloading contents from a cellular phone. It has to do with receiving records from the cellular phone company and evaluating the records and producing the documents that were produced in discovery in this case and have been marked as an exhibit for this hearing. As far as Cellebrite goes, your Honor, my understanding is the Court has not made a decision on whether or not to hold a Daubert hearing. And I apologize if I misinterpreted the Court's docket entries, but my understanding was that the Court was going to consider the briefing and then I think that the language in the dockets, or at least my understanding of them, was that we would hear further from the Court if in fact we were to proceed on calling witnesses as it relates to the Cellebrite issue today. So we don't have any Cellebrite witnesses for this hearing specifically today. If the Court is inclined to hear more information or more testimony about that, we would ask for a separate hearing on that matter.

THE COURT: I understand, Mr. Franker. There's certainly room for confusion with three and a half days of motions and numerous orders. Frankly, it occurred to me that not a whole lot is needed regarding the Cellebrite issue by way of testimony. Simply it 's going to come down to, I think, whether this information will come in at all. You already indicated -- the Government has already indicated

there's not going to be any expert testimony to support any of it. It's really going to come down to admissibility as lay evidence. Personally I was not anticipating anybody to come testify today. I felt like the briefing was adequate. That's part of the reason we asked you to take a look at Wehrle and provide your insight in that regard. I think we have enough there so I just want to make clear on the record what today was all about. Why don't we do this? Let's go ahead and go with Mr. Katey. I know his testimony probably will take a little bit of time.

How do you wish to proceed on this, Ms. Barrett? Are you going to have any witnesses at all?

MS. BARRETT: I do not intend to offer witnesses. I believe that -- or I'm confident that Mr. Katey will provide the information that I want to elicit from him in this hearing. Your Honor, I am having an internet problem and so what I'd like to do is to switch off my office internet to my hot spot because it is -- I don't know if anybody else is having the problem but I'm having the problem of the sound, not the picture, but the audio.

THE COURT: I might make a suggestion. I could see and hear you shuffling papers and I think -- since your audio was on that sometimes will mute what you're hearing. Why don't we do this; why don't we give it a try while you're on mute and see if that helps. If that doesn't, interrupt us

then we will let you switch out. Does that make sense? Does that help at all?

MS. BARRETT: I put you on mute, your Honor, and I still had that problem with regard to the audio.

THE COURT: Okay. Well, maybe it's not that then. All right. You want to make that transfer now, is that what you're asking? I don't know if you have to sign back in. I suppose you will.

MS. BARRETT: Yes, sir. I'm very sorry, but it is the internet, you know.

THE COURT: It happens. All right. We'll wait.

(Recess taken.)

THE COURT: Mr. Franker, are you ready to proceed?

MR. FRANKER: Yes, we are, your Honor. I believe that Special Agent Katey should be in the waiting room and if he is, we would call him as a witness at this time.

Dana, if he's not there for any reason, please let me know.

COURTROOM DEPUTY: He's here. I'm bringing him in now.

MR. FRANKER: Thank you.

THE COURT: All right. I see Mr. Katey. Can you hear us all right, Mr. Katey?

(Discussion held off of the record.)

(Witness sworn.)

COURTROOM DEPUTY: Please state your full name for the record and spell your last name.

MR. KATEY: Yes, ma'am. My name is Greg Katey. Last name is spelled K-A-T-E-Y.

THE COURT: Good morning. Mr. Franker, go ahead.

MR. FRANKER: Thank you, your Honor.

GREG KATEY

DIRECT EXAMINATION BY MR. FRANKER:

Q. Good morning, Mr. Katey. Where is it that you're correctly employed?

A. I'm currently employed with the Federal Bureau of Investigation.

Q. What is your title with the Federal Bureau of Investigation?

A. I'm currently a supervisory special agent or an assistant legal attaché for our office in Mexico City.

Q. Is that where you're testifying from this morning?

A. Yes, sir.

Q. How long have you been a special agent with the FBI?

A. For over 20 years.

Q. Where did you go to college?

A. I went to college at Purdue University.

Q. Did you obtain a degree?

A. I did. I obtained a bachelor's of science in computer engineering from the school of electrical engineering there at

Purdue.
Q. Were you employed before joining the FBI?
A. I was. I worked as a security analyst for a global corporation.
Q. How long did you do that work for?
A. Roughly about two and a half years.
Q. Getting back to your employment with the FBI, what offices have you been assigned to in your tenure with the Bureau?
A. I worked for the Springfield and the Phoenix divisions as well as currently being assigned to the US Embassy here in Mexico City.
Q. When you said Springfield, is that in Illinois?
A. That is, sir.
Q. What types of responsibilities have you performed as an FBI agent?
A. I worked a vast number of the programs that the Bureau has. Criminal matters such as gangs, bank robberies, kidnappings, missing persons. I also worked cyber matters, cyber intrusions, violent crimes against children, counter terrorism, Indian country. It is a large number of programs.
Q. What are your current responsibilities with the FBI in Mexico City?
A. I'm currently representing the United States Government and specifically the FBI and its interest here in Mexico working with local law enforcement partners trying to reach

those goals of the United States.
Q. Are you also a member of the Cellular Analyst Survey Team?
A. Yes, I am.
Q. Is there an acronym that survey team goes by?
A. Yes, there is. It is CAST, C-A-S-T.
Q. What is the Cellular Analyst Survey Team?
A. Back in 2010, the Bureau recognized that a large number of its investigations were involving individuals who may have carried or had or subscribed to cellular devices. There was a small group at the time that was utilizing records successfully to locate individuals and solve crimes. And so in 2010, the FBI set up a unit named the CAST unit, known now as the survey team, which began specialized training, selecting individuals, certifying them and then having them focus on the review and analysis of call detail records.
Q. How long have you been a CAST special agent for?
A. I was certified in 2016.
Q. What exactly is historical cell site analysis?
A. Historical cell site analysis is after receiving records from the telephone companies, those records are analyzed and we use three different things. We use the call detail records, which are like normal. They have the to, the from whom, the to whom the call is, the date and time, the type of transaction and the duration. These call detail records also have which part of the network that that phone utilized to

place that call.

We used the cell tower list, which is a list provided by the telephone companies. That list indicates where their towers are physically located. And using those two together, we also use a mapping program that then visibly displays the tower and the infrastructure, the network, being used and the interaction with the phone in that specific tower at that date and time.

Q. What is the purpose of historical cell site analysis?

A. The purpose of it is to assist in our investigations to identify where a device may be at a specific date and time in history.

Q. As part of CAST, have you received any specialized training regarding cellular telephones, cellular technology and historical cell site analysis?

A. I did.

Q. And what was that training?

A. CAST provides a certification track, that initial part of that is a CAST basic class that is usually a one week class where the candidates are provided an introduction to what call detail records are, what they look like and initially how to review them. And that's provided for each of the major carriers that exist in the United States. After that one week course -- going through that course, you're kind of being evaluated to determine whether you have the will and the

desire and the capability to move on and then you're selected for an advanced class.

It's similar to the basic. It's a one-week class where you're provided, again, with records and additional training, more detailed analysis. You're also beginning to be pushed with time, and again, being evaluated to determine whether you're a candidate to move on.

After the advanced class, there's a field training exercise where it's a mock command post set up where an incident is described and that individual is in charge of making requests for the records that they would need, analyzing those records and then providing advice and recommending what type of resources would be needed as a result of that analysis.

Through that, again, you're being evaluated to determine whether you're a candidate to move on. At that point, you're put in a certification course. That certification course is four weeks, two weeks of which is college level intensive cellular theory that is taught by academia as well as engineers from the telephone companies. And then the subsequent week is you are provided with a case and you work that case and then you present that case. If you've passed each of those levels, then you would be considered certified.

After certification, annually, there's a

recertification and requirements for training in order to maintain the CAST certification.

Q. All this training that you just described, is that all done by the FBI?

A. The FBI has its own trainers internally, but it also utilizes individuals from academia, universities. It also uses individuals that are located at the telephone companies of AT&T, Sprint, or what used to be Sprint, T-Mobile, Verizon and U.S. Cellular to assist in that teaching.

Q. The training from the cellphone companies, do you ever speak directly with engineers from the cellphone companies?

A. We do.

Q. And why is that?

A. Because we want to speak to the horse's mouth. We want to understand what their thought process is, understand why networks are designed in certain ways as well as to understand if there's changes or if there's, you know as -- as we're approaching 5th generation of cellular technology, also understanding of what their goals are and when they're planning to implement.

Q. Special Agent Katey, all the training that you described with the FBI and the cellphone companies, did you do all of that training personally?

A. Yes, I've been through the training.

Q. And were you certified as a CAST analysis expert?

A. Yes, I was.
Q. When was that again?
A. That was in 2016.
Q. When you were working as a CAST special agent, how many call detail records would you review in a given year?
A. Over 100 sets of records a year on average.
Q. Have you ever been called on to review records and asked to determine the general location of a cellphone?
A. Yes, I have.
Q. Have you ever had the opportunity to validate your historical cell site analysis?
A. Yes, sir.
Q. And how do you do that?
A. We use that through like probative evidence. So there would be probative GPS data, sometimes if there's tracker data available. We also do drive testing.
Q. What does drive testing mean?
A. Drive testing is where we take a tool or a piece of equipment that has antennas on it, similar to a phone, and what it does is it scans the radio frequencies that exist for a specific location. It collects those readings so signal strengths and quality from the various towers that are in that area, it records that. And then we can use that data to show propagation maps to indicate where coverage areas exist. It's the same tool that is readily available out there in the

market and it's the same technique that telephone and cellular phones do as well.

Q. Have you ever used historical records to locate missing persons or fugitives?

A. Yes, sir.

Q. And in what kinds of circumstances would you do that?

A. We use them when there's missing persons throughout the United States and currently I'm in Mexico. So we use that technique to locate missing kids or persons. We also use that technique to locate fugitives, where they may be located, where they frequent, where they sleep based on their usage of telephones and the interaction with networks.

Q. Have you ever actually located fugitives or missing children using this technology?

A. I'm sorry. Did you ask have I ever?

Q. Yes.

A. Yes, a lot.

Q. Approximately how many times?

A. We have about 138 kidnappings a year in Mexico and we probably return over 100 fugitives a year from Mexico. This technique is heavily involved in a large number of those.

Q. Have you ever given any training in historical cell site analysis?

A. Yes, sir.

Q. And tell us about that.

A. I've provided training to local law enforcement, state, other federal partners throughout the United States as well as currently here in Mexico providing training to our Mexican law enforcement partners.
Q. Have you ever testified as an expert in cell site analysis in federal court?
A. Yes, sir.
Q. And approximately how many times have you done that?
A. I would say at least ten times.
Q. In what districts have you done that in?
A. I've done that in the Northern District of Illinois, the Central District of Illinois, the Southern District of Illinois.
Q. Have you also testified in state cases?
A. I have, sir.
Q. And where have you testified in state cases at?
A. It would be Southern Illinois as well as in Peoria, Illinois, and McLean County.
Q. Speaking a little more generally now, can you briefly tell the judge about how a cellphone works and communicates with the cellular network?
A. Sure. When a cellphone is powered on, it begins to scan or take measurements from the towers that exist in its general area. It uses these measurements to determine what the strongest and cleanest or best signal is. Once it has

determined which one it is by comparing it to the other measurements that it has taken, it then notifies the network via a tower that it exists and that it's present and ready to receive a call and then a network, if a network had a call, it would know where to provide that call to the cellphone.

Q. What is a cell tower?

A. A cell tower is a -- it's a general term, but most people would think of it as that large metal structure that looks like an Eiffel tower that protrudes from the ground in the air and it has antennas on it. The cellular companies use that to provide coverage.

So similarly when they're designing their networks, if you think of a yard and if you were to design a sprinkler system for that yard you would place sprinkler heads throughout the yard. You may put one on the far left side of the yard that provides water, generally, in its closest area. You would probably put a sprinkler head on the far right side that would provide water to the grass on that side. And wherever that water provided, that grass would grow. You wouldn't have the sprinkler head on the far right providing water all the way to the left side of the yard. That would be a waste. And you probably wouldn't have two sprinklers providing a similar area with water. That would be a waste again. But you probably would have a little overlap between those two sprinkler heads. In other words, it would provide

water to the grass generally closest to it and the other one would provide water to its grass, but they would overlap enough to keep the grass alive.

Similarly, when engineers design those networks, they place cell towers throughout the area that they are trying to provide coverage for. They're also going to do an overlap between their coverage areas or in our case they don't want to have what are known as dropped calls. As you're moving from one area to another, they can hand that call off from one tower to the other without losing that call.

Q. Do all cell towers look the same?

A. They do not. They can look like the metal structure we just described. They can look like a flag pole. They disguise them as trees, probably not very well, but they do. They also put them on the sides of buildings, church steeples, water towers, anywhere that they can get access to that they need to provide coverage.

Q. Generally speaking, why would they put them on the side of a building versus using a tower?

A. A tower structure, they're going to have to pay for land. They're going to have to pay lease on that land. They're going to construct that tower. They're also probably going to have to commit to taking that tower down when it's no longer useful. The cellphone companies have estimated that can be a quarter million dollars or more investment. If they can

partner with an existing building, they can save a substantial amount of cost in infrastructure to put in. And when they're done, they can remove the panels and they don't have to worry about the structure or anything.

Q. Is it more common to see towers that are attached to buildings in urban areas?

A. Yes, sir. In an urban area, there may not be open land where they can construct a tower. There may be ordinances or restrictions that would prevent that. And so they would probably have to use the existing infrastructure that is in place.

Q. When you make a cellular telephone call, what is it that determines which tower the cellular phone uses?

A. It is the telephone that chooses the tower and that telephone is going to choose the tower based on the strongest and cleanest signal.

Q. Is that generally speaking the closest tower to the cellular phone?

A. Generally it is, but that's not always the case.

Q. Why is that?

A. For example, if a phone was next to a mountain and it was a sharp straight up and down vertical peak and there's a tower just on the other side of that peak, that would probably be the closest tower to that cellphone. But due to the mountain, that cell signal may be blocked and that phone could not

communicate with that tower, so it may have to use a tower on its side of the mountain that may exist further away. That would be an example of one using it further away.

Q. What records do cellphone companies keep based on the activity that you've described?

A. They keep call detail records.

Q. And so what exactly are call detail records?

A. Call detail records are similar to if we recall back when we were younger we would probably remember seeing billing records or toll records that would come from the cellphone companies, and it would record each transaction that the phone made, that would be the voice calls for like to whom and from whom the call was being placed. It would record the date and time of that transaction, the type of transaction. It would also record the duration, how many seconds that call may have taken. Call detail records are very similar to that, except for they will also have the networks interaction and that would include which tower or maybe which sector off that tower that the phone utilized during that transaction.

Q. Why do phone companies keep this information?

A. Primarily they have two reasons to keep it. They keep it primarily to charge us and to make money. Secondly, they keep it to analyze their own networks, to identify where there are trouble spots or where coverage is increasing and they need to expand and build out.

Q. Can you determine the general location of a cellphone by using the cell site records that you just described?
A. Yes, sir.
Q. And how do you do that?
A. For a specific transaction, we can determine the general location of a device if there is a transaction in the records that indicated a certain date and time, what type of transaction that may have occurred, if it's a voice call, and then we can look at the part of the network that was utilized to carry that call or initiate that call. We take that identifying information, so the tower information, and we refer to the tower list that we spoke of earlier. We use that tower list to identify which tower on that list based on the identifier in call detail records and then that tower list will tell us exactly where that tower is located with either a street address or GPS coordinates. It will also provide us information about that tower, for example how many sectors may be on it or other information that we may need or how it's oriented, which direction it's facing. And from that, knowing that as well as the infrastructure of the network, we can provide a general location for a device at a specific date and time for that transaction.
Q. Did you complete a historical cell site analysis for this case?
A. Yes, I did.

Q. And did you prepare a PowerPoint presentation that shows your conclusions from that historical cell site analysis?
A. Yes, sir.
MR. FRANKER: Your Honor, at this time I'm going to attempt to share my screen and show Special Agent Katey what we've had marked for this hearing as Government Exhibit No. 1.
So Dana, when I tried to share the screen I got a message from Zoom that says "host disabled participant screen sharing." Is there a way to enable that?
COURTROOM DEPUTY: I'm looking at it now, one second.
MR. FRANKER: Thank you.
COURTROOM DEPUTY: Okay. Now try.
BY MR. FRANKER:
Q. Special Agent Katey, are you able to see the CAST report that I believe I've shared on your screen and for everyone that is part of this hearing today?
A. Yes, I can.
Q. Okay. And is that the report that you referenced preparing as part of the work on this case?
A. Yes, it is.
Q. And in anticipation of this hearing today have you had the opportunity to review that record?
A. I have.
Q. And that's the work that you did on this case as it relates to cellular phone historical analysis?

A. Yes, sir.

MR. FRANKER: Your Honor, at this time, we would seek for purposes of this hearing to introduce Government Exhibit No. 1. This report is I believe 25 pages long and then we're going to have some questions for Special Agent Katey from the report.

THE COURT: Any objection?

MS. BARRETT: No, your Honor.

MS. FRETER: None from Mr. Griffin for purposes of this hearing.

THE COURT: All right. It will be admitted without objection.

BY MR. FRANKER:

Q. Special Agent Katey, this is the first page of your report. It appears that there are four telephone numbers as well as reductions that have been applied by the Government as part of this exhibit. Are those the four telephones you were asked to review as part of your work on this case?

A. Yes, sir.

Q. And how many of those phones were identified as being phones that were being used by an Anthony Dobbins?

A. One phone.

Q. And is that the phone that ends in 7988?

A. Yes, sir.

Q. How many phones were identified as phones associated with

a Mr. Griffin?
A. There were three phones, the devices ending in 9814, 5114 and 9807.
Q. Move on to the second page of the report. Special Agent Katey, specific to I guess paragraph one it talks about background and there's a note next to telephone number 5114. What is it that that note reflects?
A. It reflects that there were no records with location information for the analyzed period.
Q. And why is it that there would be no records with location information for that device?
A. It was not utilized or the transactions that occurred within the records did not have location information for it.
Q. Would a phone that was turned off be communicating with cellular phone towers?
A. No, it would not.
Q. What about a phone that was not used to make a call, receive or send a text message or start a data session?
A. There would not be transactions if the phone wasn't used.
Q. Is that something that you've seen before where you were asked to review historical records from a phone number, and there were no records with location information?
A. Yes, sir.
Q. And that's what happened in the case as it relates to the phone number ending in 5114; is that correct?

A. That is correct.
Q. Also in paragraph one, in the background section, there is something that reflects a date and time. Why is that date and time part of your report?
A. Because when I begin my analysis of records, I will ask for the records and then I will also ask for an event time. Typically, these analyses were provided for a specific event, be it a crime or homicide or theft or something else. And that gives me an area in which I can begin to focus. Oftentimes I'll get records that are voluminous, many, many days, and I really need to focus my time and effort in order to be effective. So in this case, I was provided with that as a date and time as an event time.
Q. For the record that date and time was May 18, 2018, at 11:35 p.m.; is that right?
A. That is correct.
Q. And that's central time?
A. Yes, sir.
Q. Special Agent Katey, I'm going to jump ahead to page three of your report. Please describe for us what exactly it is that we're looking at on page three.
A. On page three, what you are looking at on the left side is generally what a tower would look like. That's a drawing of what a tower would look like. That's indicative of a three sector tower. There are other examples of more sectors or

less, but generally this is the most common type of tower. The cellphone companies use these towers to provide coverage to the user of the cellphone and in order to increase their capacity they do what is called sectorizing their coverage.

In this case, as we look on the right side, if you imagine yourself in a hot air balloon looking down at the top of a cellphone tower you would realize that that tower was sectored or divided up into three specific areas of coverage. Cellphone companies call these areas sectors.

In this case, if we look at the one on the right you'll see sectors one, two and three. Again, looking from a hot air balloon down, you can tell one is facing due north, one is facing generally southeast and one is facing generally southwest. Within the tower records that they provide, they indicate how they've designed their network and they will provide an orientation for each sector.

In this case, sector one is facing north or zero degrees and then they'll use this zero to 360 degrees in a clocklike fashion to identify the orientation of each one of those sectors. It doesn't have to be facing due north. They can shift these slightly right, slightly left. They can move them 90 degrees if they wanted to and usually they orient the heart of a sector towards where they expect to need the most capacity or the densest population.

Q. Are three sector cell towers the most common cell towers

that are used by cellular phone companies?

A. Yes, sir.

Q. Have you seen cell towers that have a different number of sectors other than three?

A. Yes, sir. I've seen omnidirectional towers, which means it is just one sector. So in this case that would provide coverage in 360 degrees, so the entire circle around the tower. I've also seen bidirectional. So there would be two sectors. In those cases, it looks like a half circle facing one direction and a half circle facing the other direction. And --

Q. Do you know why -- I apologize for interrupting. Do you know why a cellphone company would use either just one sector for the entire tower or two sectors instead of three as we have illustrated here?

A. Sure. Again, sectorizing provides increased capacity. But it also comes as a cost for equipment and for energy. And so they will use three sectors or even higher in very dense areas. Again, the three sectors most common, but if you get need a stadium or something else that may use a higher sectorized tower or for example in a very rural area where they just need to provide coverage for thoroughfare or an interstate that may cross that area they may do a bidirectional tower that provides coverage in each direction of the traffic that may cross that interstate, not concerned

at all about providing coverage into the desert or an area in which there is no population.
Q. Does the cell tower list that you testified that you receive from the cellular phone companies tell you for a specific tower how many sectors it has?
A. Yes, they do.
Q. And the analysis that you did on this case, how many sectors did those cellular towers have?
A. Three.
Q. And that was universal for all the cell towers that you did an analysis for in this case?
A. For the towers that were utilized, yes, sir.
Q. Let's move forward to page four of your PowerPoint presentation, which I'm showing you on this screen. What is it that we see in this picture?
A. What we see is an icon that would be displayed in the following analysis or depictions. What we see here is we have -- we have two lines that form a vertice or an intersecting point. You'll see that dot. That dot will indicate where the tower is physically located. The wings or the sides that protrude out from that dot indicate the sector that we just talked about and then you'll see just almost a half circle shape on the inside of that sector. That half circle allows the viewer to understand that we are talking about that side of the tower, that side of the sector. It

does not indicate coverage. All it does is draw the eye to that side of the tower.

Q. Does it indicate that a specific cellular phone that you're providing analysis on is within that shaded section?

A. No, not at all.

Q. The only purpose of that shading section is to show the individual that is looking at this picture which side or which sector of the tower that you're evaluating or that the phone is communicating with?

A. That's correct. For example, if this was a bidirectional tower, instead of it having the angle of the vertices there, what you would have is a straight line with a dot in the middle. And in order for me to easily describe which side of that sector is being utilized we use that indicator there, that short small half circle, to indicate the side in which the coverage is being provided.

Q. Is that little shaded circle that we're speaking about, is that something that just you use or is that used across the training and the PowerPoint presentations that are produced by CAST analysts nationwide?

A. Nationwide, sir, CAST analysts.

Q. Let's move forward to page six which should now be in front of you. Do you see that?

A. I do.

Q. What is it that we're looking at in page six of your

presentation?

A. This is the beginning of the analysis of the device sending in 7988.

Q. And that, again, was the device associated with Mr. Dobbins; is that right?

A. That's correct.

Q. And that is a Verizon cellular phone?

A. Yes, it is.

Q. What do we see in this picture?

A. So what you see here is an overview. It's an aerial map of the area around East St. Louis and Troy, Illinois. On the far right, you'll see a legend that identifies various things that you will see on that map. For example, the red dot will indicate where Verizon has placed their towers or their infrastructure. Again, you will see that icon, that wing shaped icon, with almost a half circle into it. That indicates a sector. When we talk about the device utilizing the tower and sector, you will see that icon associated with the tower. You will also see a yellow label on the map with the letter D in it. That indicates for geographical orientation where 306 Meadow Drive, Apartment 4, in Troy, Illinois, is located.

Q. Is that address something that was given to you as part of your investigation in this case?

A. It was.

Q. And that's why you placed it on the map and included it in your analysis?
A. Yes, sir.
Q. I see several different towers on this map that looks like there was a cellular phone communication with at different times; is that accurate?
A. That is accurate, sir.
Q. Okay. And this is May the 18th, 2018, between 3:10 p.m. and 3:43 p.m.?
A. Yes, sir.
Q. And generally speaking all of these towers are within the East St. Louis metropolitan area in the Southern District of Illinois?
A. Yes, sir.
Q. For purposes of this hearing we're not going to go through each communication that a cellular phone communicated with a tower in order to save time. We'll just kind of speak generally. If I have more specific questions, I'll let you know.
Let's move forward to page seven. Is this, again, still the same phone that ends in 7988 associated with Mr. Dobbins?
A. Yes, sir.
Q. Can you describe what we see in page seven on your PowerPoint presentation?

A. Sure. On page seven, we see the analysis for that device on May 18th between 3:43 and 7:44 p.m. What we see is the device at 3:43 p.m. utilizing cell ID 214235 in sector two, which is located generally in the East St. Louis/Troy, Illinois area. Over that next several hours, we see the device begin to utilize towers in Springfield, Lincoln, Bloomington and eventually in Chicago ending at 7:44 p.m. We see it utilized a tower that is indicated there with a red dot and a number seven in it. It's identified as cell ID 202434, sector 32.
Q. On the bottom part of the screen, the first communication that is part of this exhibit appears to be at 3:43 p.m. in the East St. Louis area; is that correct?
A. Yes, sir.
Q. And then you see various interactions with cell towers along it appears to be Interstate 55, am I reading that correctly?
A. That's correct.
Q. And then eventually there's communication with cellular towers at the top of the screen at 7:44 p.m. and that is generally speaking in the Chicago area; is that right?
A. Yes, sir.
Q. And it looks like there's approximately four hours between that is reviewed as part of this exhibit; is that correct?
A. Yes, sir.

Q. Have you driven from the East St. Louis area to the Chicago area before?
A. Yes, sir.
Q. And are the timeframes that are on the -- your PowerPoint presentation here consistent with how long it would take to drive from the East St. Louis area to the Chicago area?
A. Yes, sir.
Q. And based on your analysis in this case, did you form an opinion about a general direction of travel of the cellular device itself?
A. Yes, it traveled from generally East St. Louis area, travelling north, northwest to the Chicago area.
Q. We kind of already covered this in the background, but I want to talk specifically about your analysis in this case. Where we have communication with cellular phone towers, there are things in these boxes that you have in your exhibit. For instance, you have an outgoing call at the bottom of the screen at 3:43 p.m., an incoming call at 4:57 p.m. Am I correct in stating that you will only be able to do an analysis on the general location of the phone when it communicates with the tower because there's either a telephone call, a text message or a data session?
A. That's correct.
Q. In other words, this isn't a realtime location data of the phone. It's only when the phone communicates with the tower

and what is on the map that we're seeing is not where the phone is, it's where the towers are?
A. That is correct.
Q. Let's move forward then to slide number eight. This is on, according to the slide, May 18, 2018, between 7:44 p.m. and 8:08 p.m. The same telephone number 7988 associated with Mr. Dobbins; is that right?
A. Yes, sir.
Q. Tell us what we see in this screen.
A. We see the analysis between 7:44 and 8:08 p.m. for the device ending in 7988. We see beginning at 7:44, the device utilized the cell ID 202434, sector 32. And then that is indicated there on the map with the red dot with the one in it just to the east of Glenwood. And then we see at 8:07 p.m. it utilized tower 202435, sector three. That is a tower on the map along Glenwood Dyer Road. That is indicated with a number two in the tower and the sector that faces generally west at 270 degrees. The last transaction occurs at 8:08 and the device utilized tower 202554, sector two. That is the sector that is identified on the map with the tower and the reference number three. That sector faces generally south at 195 degrees.
Q. There's also an indication of a G in yellow on the map and it appears that there is an address associated with that. What is that?

A. That is an address located at 828 East Glenwood Dyer Road, 2E, in Glenwood, Illinois.
Q. And is that an address associated with Mr. Griffin?
A. Yes, it is.
Q. Let's move forward to number nine, this is page nine of your presentation in the Government's exhibit. What do we see on page nine?
A. On page nine, we see the continuing analysis of the device ending in 7988 between 8:26 p.m. and 11:31 p.m. What we see is at 8:26 p.m. the device utilized the tower identified as 504366, sector 32. It's actually sector two, the second stack of antennas on that, but that's located on the map with the tower, the red dot with the label one on it. That's just south of the Calumet Heights area to the east of Stormy something Avenue and then we see the device utilize the tower 204356, sector three at 11:25 and 11:31. That is a tower located within the South Shore Park neighborhood indicated there on the map with the number two in the label of the tower. That sector faces generally west at 255 degrees.
Q. I also see on the map there is a red dot as well as a time of 11:35 p.m. It appears that there's an address associated with that red dot of 7159 South Euclid Street in Chicago, Illinois; do you see that?
A. Yes, sir.
Q. And that is indicated on the map because of its

significance to the case; is that your understanding?
A. Yes, sir.
Q. It's your understanding that is where a murder occurred at that general location at that time?
A. Yes, sir.
Q. Let's move forward then to page number ten of the Government exhibit. Are we still looking at phone number 7988 associated with Mr. Dobbins?
A. Yes, sir.
Q. And this is between 11:31 p.m. and 12:21 a.m.; is that right?
A. Yes, sir.
Q. At the top of the screen, I see what is identified as the first cellular tower. There's an incoming call at 11:31 p.m. and 47 seconds. Is that the same incoming call that we saw on the last screen?
A. Yes, it is.
Q. And I also see on the bottom of the screen there is some cellular phone activity from a number two it looks at 12:20 and then 12:21 a.m.; is that correct?
A. Yes, sir.
Q. What is the significance of this picture?
A. We can tell that 11:31 the device was utilizing a tow er in the South Shore neighborhood and then at 12:20, 12:21, that same device is utilizing a tower in generally the Glenwood

area of Illinois.

Q. Also, in this map we see two addresses that we previously spoke about, the first one on the top of the map, the 7159 South Euclid Street in Chicago, Illinois. That's the location of the murder. And then you also see the one with the G. Is that the address that we previously spoke about associated with Mr. Griffin?

A. Yes, sir.

Q. Let's move forward then to page 11 of the Government exhibit. Specifically now we're looking at an analysis that was done on Mr. Dobbins' phone again, the 7988 number; is that correct?

A. That is correct.

Q. What do we see in this picture?

A. We see the analysis between 12:28 a.m. and 1:52 a.m. We see the device begin to utilize at 12:28 a.m. the tower identified as 202554, sector two. That tower is located in the Chicago area. And then we see the device subsequently used towers that go through Tinley Park, Joliet, Odell and Pontiac, ending in Pontiac at approximately 1:49 and 1 :52 a.m., utilizing tower 207313, sector one.

Q. Special Agent Katey, based on your review and analysis on this case have you formed an opinion about the general direction of travel of that cellular telephone device between 12:28 a.m. and 1:52 a.m. on May the 19, 2018?

A. Yes. That device traveled west to the Joliet direction and continued south towards the Bloomington or Pontiac area, generally along the interstate I-55 corridor.

Q. Let's move forward to page number 12 of the Government exhibit. This appears to be the same device 7988 on May 19, 2018, between 4:10 a.m. and 4:42 a.m.; is that accurate?

A. Yes, sir.

Q. And what do we see as part of page 12 in this picture?

A. We see the device initial utilized the tower at 4:10 a.m. That tower is 214058, sector two. That's located just north of Troy, Illinois, along I-55. Then we see a device utilized a tower 214014, sector three. It utilized two separate sectors on that tower, both facing the same direction, indicated by three and 33. That's indicated by the tower there near Troy, Illinois, with a reference number two on the tower on the map. That's a sector generally facing southwest at 240 degrees.

Q. We also see an address that you previously testified to that is associated with a D on the map, the 306 Meadow Drive, Apartment No. 4 in Troy, Illinois. Is that the same address that you previously testified to that is associated with Mr. Dobbins?

A. Yes, sir.

Q. Let's move forward to page number 13. What do we see in this picture?

A. We see the analysis for the same device ending in 7988 between 4:00 p.m. on May 19th to 6:55 a.m. on May 20th. Beginning at 4:00 p.m., we see the device utilize a tower in the southwest area of East St. Louis indicated with the number one on the icon of the map. We then begin to see the device utilize other towers, the tower that is indicated as number two at 4:05, 4:07, 4:41, 4:44 and 4:45 p.m. on May 19th, still within the East St. Louis general location. And then at 5:06 p.m., we see the device utilize tower 214451, sector two. That is a tower located there underneath the Maryville icon on the map referenced with the tower number three. And then we see at 6:15 p.m., the device utilized tower number four. That's identified as 214280, sector one, on the map, facing generally north towards the Edwardsville area.

And then on May 19th, beginning at 9:56 p.m. and continuing at 10:02 and 11:39 p.m. and also on May 20th at 6:55 a.m., we see that same device ending in 7988 utilized the tower that is referenced as number five on the map over near O'Fallon. That cell ID is identified as 214191, sector three. That faces generally west at 240 degrees.

Q. I also see on the map there appears to be a new address and a new marker which is shaded in pink; do you see that?

A. Yes, I do.

Q. What is that address as a part of that exhibit?

A. That is One St. Elizabeth Boulevard, O'Fallon, Illinois,

and that is where the St. Elizabeth Hospital is located.
Q. Let's move forward to page 14 of Government Exhibit No. 1. What do we see here in page 14?
A. We see the device 7988 for the period of 8:29 a.m. to 8:30 a.m. on May 20th, 2018. We see that device utilized the tower identified as 214401, sector one. It's identified on a map with the tower reference number one. It's located just north of Interstate 64 in the O'Fallon area. That sector faces due north at zero degrees.
Q. Is -- I see the same pink marker. I believe it's the same pink marker identifying St. Elizabeth's Hospital from the last slide. Is that the same address that you just testified to on page 13?
A. Yes, sir.
Q. Let's move forward then to page 15. It seems to indicate that this page 15 is going to start the analysis of the phones associated with Mr. Griffin; is that accurate?
A. Yes, sir.
Q. And so your analysis then is finished with the 7988 number associated with Mr. Dobbins?
A. Yes, it is.
Q. And we've already -- you've already testified, I believe, that the phone number ending in 5114 did not have any location data that was associated with it; is that correct?
A. For the period analyzed, yes, sir.

Q. So let's move forward to page 16 of Government Exhibit No. 1. What do we see here on page 16?

A. On page 16, we see the beginning of the analysis of the device ending in 9814 for the period of May 18, 2018, between 7:44 p.m. and 8:03 p.m. Beginning at 7:44, continuing at 7:57 and 8:03 p.m. the device utilized cell ID 35561, which is indicated on the map with the red dot in the reference number one. That sector is facing due north at zero degrees and was located south of Glenwood.

At 7:59 p.m., we see the device utilizing cell ID 5123. That's indicated on the map with the red dot with the reference on number two. That sector faces generally south at 200 degrees.

Q. Let's move forward to page 17 of this exhibit. What do you see in this photograph, sir?

A. We see the analysis for the device ending in 9814 between 8:03 p.m. and 8:34 p.m. We see the device initially utilizing at 8:03 p.m., cell ID 35561. That is the tower located south of Glenwood. And then we see the device continue to use other towers. Beginning at 8:17 p.m., a tower there in the South Holland area along I-94. We see that at 8:17 p.m. and we see it utilized cell ID 1172, indicated by number three on the map. That is just south of the Roseland label on the map still along I-94.

At 8:27 p.m., we see the device utilized cell ID

21159, sector three at 8:27 p.m. That sector is just at the Route 20 and I-94 interchanges south of the south Chicago area. And then we see it utilize the tower that is referenced as the number five icon. That's cell ID 20313. That's at 8:30 p.m. That tower is located south of the South Shore neighborhood.

At 8:34 p.m., we see the device utilize cell ID 21163, sector two. That's indicated there on the map with the red dot with the number six in the icon, and that is located in the South Shore neighborhood of Chicago, Illinois.

Q. And I see two addresses that are indicated on here. Are those the same? One is indicated with the yellow marker and it's 828 East Glenwood Dyer Road, Glenwood, Illinois, is that the same address that you testified about associated with Mr. Griffin when you were speaking about Mr. Dobbins' cellphone?

A. Yes, sir, it is.

Q. And the 7159 South Euclid Street, Chicago, Illinois, that is indicated in red, is that the same address that you testified about earlier as it relates to a murder that occurred at that address?

A. Yes, sir.

Q. Let's move forward then to page 18 of Government Exhibit No. 1. What does this paragraph depict?

A. This depicts the analysis of the device ending in 9814 between 8:37 p.m. and 9:33 p.m. Beginning at 8:37 p.m., we

see the device utilized the tower and sector referenced on the map with a red dot in the icon number one. It is named cell ID 34252. That sector faces generally southeast at 120 degrees providing coverage in the South Shore neighborhood.

And then we begin to see the device at 8:59, 9:13 and continuing through to 9:33 p.m. utilizing cell IDs 9641, 34081-11 and 34081-1. All those sectors are on the same tower located there off of 75th Street. That sector is indicated there on the map with a red dot with the number two in it. That sector faces due north at zero degrees and provides coverage to the South Shore neighborhood area.

Q. Special Agent Katey, we see here on this page 18 we see some of the shading that you testified to when you were generally speaking about the PowerPoint presentation. Do those shaded areas indicate that the cellular telephone is within the areas that are shaded on the map?

A. No, sir.

Q. And again, why are those areas shaded as they are on this page?

A. They're shaded to identify the fact that the sector in this case, sector that is identified as number two, is facing north, the inside of that angle. And as far as it relates to the tower that is referenced as number one, it's the sector that is inside that angle that is facing generally southeast.

Q. Other than saying that this cellular phone communicated with these specific towers at this time, is your analysis able to tell you any more specifically where exactly this cellular phone was located at these times?

A. Just that it was provided within the cell footprint coverage area of the tower that it's utilizing at that time.

Q. Let's move forward to page 19 of Government Exhibit No. 1. What does page 19 depict?

A. On page 19, it depicts the device ending in 9814, the analysis for the period on May 18th between 9:51 p.m. and 10:47 p.m. Beginning at 9:51 p.m., the device utilizes the tower there referenced on the map with a one. Cell ID is 16533. That's just north of the Roseland label on the map. And then at 9:56 p.m., it utilizes the referenced tower number two, which is cell ID 21263. That is located on just southeast of the Roseland label on the map, along I-94. And then at 10:47 p.m., we see the device utilize cell ID 16971. That is the tower to the west side of Glenwood identified as cell ID 16971 and labeled with number three on the map.

Q. Let's move forward to page 20 of the Government exhibit. What is it that this map depicts?

A. This map depicts the analysis conducted for the device ending in 9814 between 11:25 p.m. and 11:31 p.m. on May 18th. It shows the device utilizing cell ID 9641 at 11:25 p.m., 11:29 p.m. and 11:31 p.m. The sector utilized is identified

there on the map with the red dot with the one and the wing shaped icons. That sector was facing due north at zero degrees.

Q. We were on page 20. I accidently skipped ahead, but let's do so now to page 21. This still appears to be the same device number ending in 9814; is that right?

A. That is correct, sir.

Q. Does this map -- we won't go through each individual cell towers, there's quite a few here, in the interest of time, but is it your testimony and your analysis that this cellular phone communication with all of the towers that are listed on the map?

A. Yes, sir.

Q. Okay. And is there -- did you form an opinion based on your analysis that is here on page 21 about a general direction of travel of the cellular device ending in 9814?

A. Yes, sir.

Q. And what is that?

A. Beginning at 12:30 a.m. that it travelled in a west direction out of the Chicago area through Joliet, continuing down towards the direction of Bloomington along the I-55 corridor and eventually arrived in the area of Troy, Illinois, at 4:10 a.m. I shouldn't say it arrived at that time but it began using towers at that time in Troy, Illinois, before 10 a.m. on May 19th.

Q. Is Troy, Illinois, is in southern Illinois in the East St. Louis metropolitan area; is that correct?
A. Yes, sir.
Q. Let's move forward to page 22. What does page 22, what does the map on page 22 exhibit?
A. On page 22, we see the analysis for the device ending in 9814 for the transaction that occurred at 4:10 a.m. We see it utilize cell ID 52453. That's indicated there on the map with the red dot with the number one reference and that sector faces generally west at 270 degrees.
Q. Move forward now to page 23 of Government Exhibit No. 1. What do you see in this map on page 23?
A. We see the analysis of a device ending in 9814 between 4:01 p.m. on May 19th through May 20th, 2018, at 6:58 a.m. The device beginning at 4:01 and continuing to 7:23 p.m. utilizes the cell ID referenced on the map as number one. That is the cell ID identified as 37328, sector three, also identified as 51103, 51102, all located on the same tower facing the same direction. That faces 260 degrees or generally west direction. And then beginning at 9:11 p.m. on May 19th and continuing through to 6:58 a.m. on May 20th, the device utilized the tower that is referenced on the map with the number two. That's cell ID 25454, sector three. It's also identified as 52452 -- excuse me -- 52453 on the map generally in the Troy, Illinois area.

Q. Let's move forward now to page 24. What is it that we see on page 24?
A. On page 24 we see the analysis for the device ending in 9807 on the May 19th at 5:21 p.m.
Q. And is this a different device than the other device that you testified to over the last several slides, the 9814 device?
A. Yes, sir.
Q. And there's only -- it looks like from your map that there's only one communication with the cellular phone tower; is that correct?
A. That is correct.
Q. And was this the only communication with a cellular phone tower during the period of analysis that this device did based on your review of the call detail records?
A. That is correct. The device was not utilized that frequently. The only other previous transaction occurred I believe at 5:24 p.m.
Q. And page 25 is the end of your report. I'm going to stop sharing the screen now at least for the Government's questions. I don't have any further questions on this exhibit.
THE COURT: All right.
MR. FRANKER: I do have a couple further questions. I'm almost done, Judge.

THE COURT: Oh, okay.

BY MR. FRANKER:

Q. You spoke about when you were talking generally about something called a drive test that is sometimes performed as part of a historical cell site analysis. Is that something that you did as part of your analysis in this case?

A. Specifically, we do drive testing on certain cases. I do have drive test data for -- or experienced drive testing in the Bloomington area, some areas within the East St. Louis areas as well as areas up in the Chicago area, yes, sir.

Q. Did you do any work specifically in Chicago as it related to your analysis in this case?

A. I did.

Q. And what was that?

A. I took advantage of the last time I flew into the Illinois area, I flew into Chicago O'Hare. I utilized the vehicle to drive the areas of the South Shore Park area as well as Glenwood, Interstate I-55 down to the East St. Louis area.

Q. And what were your conclusions, if any, that you came to as a part of your analysis that you did while you were in Chicago and then driving south?

A. It made no change to my analysis.

MR. FRANKER: Your Honor, at this time for purposes of this hearing I don't believe we have any further questions for Special Agent Katey and we'd pass the witness at this

time.

THE COURT: All right. Thank you, Ms. Barrett?

MS. BARRETT: Yes. Thank you, your Honor.

CROSS-EXAMINATION BY MS. BARRETT:

Q. To the drive test question -- good morning or afternoon I'm not sure what it is for you guys, but it's 11:47 here. In terms of the drive testing, did you test particular cell sites in that drive test?

A. I mean, we would take measurements from the various sites in that area. Not all of the specific drive testing was done specifically for this. For example, like the Bloomington Normal area was drive tested for the general purpose of having that area drive tested, but not specifically for this case.

Q. Okay. So I'm not clear then. When you said -- when was this done?

A. Ma'am, it could have been done multiple times since 2016.

Q. Okay. I thought you said that you took advantage of a time when you were in the Chicago area to do drive testing?

A. Yes.

Q. So this was done on more than one occasion?

A. Yes. If you give me here just a second, I can probably answer that question more specifically.

Q. Can you tell us what you're looking at?

A. Yes, I am looking at my calendar trying to figure out when the last time it was I flew into Illinois for CAST testimony

purposes. I believe that was conducted over the periods of probably around October 29th through probably November 6th, 7th timeframes, ma'am.

Q. Can you identify specifically which cell sites you tested for the strength of signal and the range of the cell site?

A. Yeah, I would have -- I drove test the entire South Shore neighborhood so any towers or sectors that were located within that area. I also drove the interstate. I drove the area around Glenwood. I also drove I believe in various areas of the labels that are located. A large majority of that isn't specifically for the drive test purposes. It is to observe the towers, the pathology and the morphology of the areas as well as to understand the potential route of traffic and try to corroborate the usage of the cell network.

Q. Did you use specialized equipment to measure the strength of signal in those particular areas?

A. I mean we have receivers that we utilize that measure those signals, yes.

Q. All right. And can you identify which towers whose signals you measured?

A. Any tower or sector that was located in the area at the time when that drive test would have been measured so all of them.

Q. So you have those measurements?

A. I can provide probably a CSV file with those measurements.

Q. And did they identify the towers by number?
A. They will identify the tower based on what is being provided in the broadcast channel from each tower, identifying the tower, yes.
Q. I don't -- what I'm asking is you have identified towers here by specific numbers and sectors, and I'm asking if you have that drive test information broken down by those individual towers identified by the numbers and sectors?
A. Yes. I can make a request for that data and provide you with all of the data that was collected.
Q. I'll make a request for whom? I thought you conducted the test.
A. I do, but it gets stored until requested to be downloaded and provided. Is that something that you would like, Ms. Barrett?
Q. Yes, please. That is something that I would definitely like.
Did you drive -- specifically drive test the towers that you have identified as having been used by these phones?
A. I drove the entire area.
Q. That wasn't my question, sir.
A. Okay.
Q. The question is, it's my understanding that telephone companies drive test individual towers; is that right?
A. That is a technique that they can use, yes.

Q. And they use it to determine the range of the tower and the strength of the signal, correct?
A. Yes, ma'am.
Q. So what I'm asking you -- and they do it by individual tower and sector of towers; is that right?
A. I believe -- I believe we're saying the same thing, yes, ma'am.
Q. Is that what you did for the sites -- for the towers that are listed here?
A. Yeah. Generally, I think the challenge that we're having here in the discussion is my drive test is I'm driving every street or as many streets as I can drive in an area in order to form basically what looks like a heat map or an understanding of what cell signals would be provided at certain areas within that area that I've driven. As a result of collecting the signals, that map can then be interpolated and similarly, the telephone companies don't necessarily drive a specific tower and sector. They may drive an area to understand what coverage is being provided to that area where they may have a dead zone or where they may need to build more infrastructure.
Q. Did you measure the coverage of individual cell towers and produce either a document, a representation of that particular coverage area?
A. I can provide you with the CSV file with all of the

measurements and the GSP coordinates for each measurement taken at each one of those locations.

Q. I'm sorry. I'm talking about the towers themselves.

A. Yes, ma'am.

Q. Did you develop a picture of a sector that --

A. I have not developed a picture.

Q. So you would not know the outlines of the sector of each individual tower based on your drive test; is that right?

A. I can tell you the general outlying coverage areas most likely on some of the towers on the date in which the drive test was done.

Q. I'm not asking you with regard to a general outline. I'm asking you if you specifically measured the signal strength, range of individual cell towers and when you did that?

A. As I explained, that was done at the end of October and the beginning of November, all that data was --

Q. Of this year?

A. Yes, ma'am.

Q. This is four years later, correct?

A. That's correct.

Q. And is it not the case that cell tower ranges and signal strengths change over even months?

A. I think that's a very general term or question that I think you're asking. Can you be more specific?

Q. The range? Are you telling the Court that this is an

accurate representation of what the cell tower coverage was in May of 2018?

A. Ma'am, I did not put a cell coverage area in my report. I am not indicating to the Court that the drive test that was done in November is the exact network coverage that occurred in May of 2018.

Q. Well, it's not simply -- not the exact. It could be completely different; is that right?

A. Yes, it could be.

Q. So your drive test is not really relevant here; is that correct?

A. Any work that I do, I oftentimes consider it to be relevant because that driving allows me to orient myself to that area, allows me to understand where the locations are, verify that an address that is provided is actually where it's supposed to be located, where I've plotted it on my maps. I do believe that my work is relevant, yes, ma'am.

Q. Has there been any construction in the area of Chicago between 2018 and now?

A. I would presume so, yes, ma'am.

Q. And isn't it true that cellphone signal coverage is impacted by building of buildings, change in topography, trees, all kinds of changes, correct?

A. Yes, ma'am.

Q. So there's no way that the drive test that you would do in

2022 would reflect the conditions in 2018; is that right?
A. I'm not suggesting that, ma'am.
Q. Okay. That's fine. You mentioned in your direct examination about verifying results and could you go into that a little bit more about how you verify that your results are accurate, correct?
A. Sure. I can give you various examples within this report. For example, I believe there are three incidents that I can speak to specifically, I would draw your attention. I believe there's a situation where there's corroborative evidence potentially where an individual was driving through a toll booth on May 18th at 7:31 p.m. in an eastbound direction near I-294 and 163rd in the Chicago area. I use that information to then overlay and look at the analysis that's already been conducted to see if that's reasonable and to see if that matches up. If the device were to be in that vehicle, would that actually be corroborative. In this case, it was. I also used -- I believe there was an incident where a police officer had ran a license plate. I believe that was in the Dolton Village. A police officer ran a license plate on May 19, 2018 at 12:26 a.m. I used that information and I overlaid onto the analysis that was already conducted to see if that was a reasonable outcome for that date and time if the device were to be in that vehicle. And again, it was. The third incident that I would draw your attention to would be on May -- I

believe May 19th, May 20th timeframe for the device ending at 7988 was with Mr. Dobbins. I believe he provided that information to a nurse as his telephone number. He was there receiving medical care. And I used that information to overlay and look at the analysis and decide if Mr. Dobbins had that device and he was, in fact, at the hospital in O'Fallon Illinois at the St. Elizabeth Hospital, would that be corroborative of that and further validate the analysis? And I believe it does.

Q. I wasn't talking about that kind of verification, sir. What I was referring to was verification of signal strength, direction of the cell sites and the conclusion that a sector extends in a particular direction. How do you verify that information other than by the telephone records themselves?

A. I believe the telephone records are accurate. We analyze those. For example, when I look at -- I'll draw your attention to slide 11. When I look at the usage of towers, which don't necessary have -- I am not referencing a side or a sector of a signal. I can see a general pattern. That pattern is corroborative in and of itself. It is indicative of traffic from the Pontiac area or, excuse me, from the Chicago area to the Pontiac area. It's reasonable and logical that an individual would take the route of interstate I-55.

Q. Verify the records. That doesn't verify the accuracy of the telephone records themselves. How do you verify the

accuracy of the CDRs, the tower lists and whether or not those individual towers are or were functioning in May of 2018?
A. To your question about functioning, for a call to be carried or transact on a tower or sector that tower and sector has to be functioning at the time.
Q. I understand that. What about the towers in the vicinity of that or within a mile of that particular tower? How do you verify that the phone was using the closest tower when you haven't gotten mechanical records or records that indicate whether or not the towers that the phone isn't communicating with are actually functioning?
A. Let me break your question down, Ms. Barrett. I believe you stated that I am stating that it's using the closest tower. I would bring you back to my direct. I'm saying that the phone is utilizing the tower and sector with the strongest and clearest signal, which may not be the closest, but it's the tower with the strongest and clearest signal. I'm further saying that the device is within the cell footprint coverage area of that tower and sector. It may also be in the coverage area of an adjacent one; for example, that overlap area. I want to be clear. I don't want to have my testimony misstated. I'm not necessarily suggesting the closest, but I'm suggesting that phone is within the tower and sector in which it is identified in the transaction.
Q. And how do you determine the coverage area of a particular

tower? Is it not true that a tower can have coverage for a mile away?
A. It's possible depending on the area and the topography.
Q. So it doesn't necessarily put that phone -- it can put that phone as far as a mile away from a particular tower; is that right?
A. I think you have to be specific when you talk about which tower or which area. For example, in rural areas. So if we look at, for example, I would draw your attention to slide 12. Probably slide 13 would be better.
Q. Can we talk about the urban area first?
A. Absolutely. That is where I was going to with slide 13. Ms. Barrett, if you look at the left side of the map you'll see the coverage area and the towers plotted for the St. Louis area. Those towers are going to be much more densely constructed. Much closer. They need a tier capacity and they need to provide coverage to the immediate area and so you're going to have towers providing much smaller ranges than, say, a rural area. For example, if you look to the further right of your map you'll see Southern Illinois as you move out towards Trenton, St. Morgan, St. Jacob and Lebanon. Those towers are spread very far apart. They are providing a much larger coverage area. They can do that because there's less need for capacity. There's not as much population in that area.

Q. Do you have the exact coverage areas for the towers that you have identified on your maps?
A. I do not have exact, no, ma'am.
Q. You mentioned that you reviewed items here, one of them being the CDR records and the other one being the tower records of the phone company; is that right?
A. Yes, ma'am.
Q. Was there anything else that you reviewed -- oh, I think you mentioned the mapping software; is that right?
A. That's correct.
Q. Where does the mapping software come from?
A. So we utilize various different mapping softwares. We'll utilize a program called ESPA. We'll utilize a program called Google Earth. We'll utilize a program called CASTViz. And we will also utilize a program called MapPoint. Those are the various mapping programs that are used.
Q. What program did you use to make the maps in this case?
A. I used CASTViz, ESPA and probably Google Earth for parts of it. The presentation that you're seeing is ESPA maps.
Q. These are ESPA maps?
A. These are maps from ESPA.
Q. And with regard to the mapping, does the -- is it the program that decides what the illustrations are on the maps? For instance, the vector and the shaded areas, is that the mapping program that does that or is that something that you

input into it?
A. So we're inputting the call detail records and the tower information and then we are displaying from that.
Q. And the -- so it's the program that produces the illustrations; is that it?
A. Yes, ma'am.
Q. And that program has a built-in function which illustrates the cell towers that have been connected to individual phones with this V shape with the shaded area; is that right?
A. Yes, ma'am.
Q. Now, the records that you used I believe you testified were maintained by the service providers, true?
A. That is correct.
Q. And is there a way to verify and validate the accuracy of the cell site locations in the CDRs?
A. Are you talking about the actual locations of towers? I'm confused on your question, Ms. Barrett.
Q. Is there a way to verify the accuracy of the cell site locations? I'm referring to cell sites, not cell towers. I believe you are using them interchangeably. The reason I use cell sites is because they're not all towers. If we want to talk about towers, that's fine.
A. That's perfectly fine, ma'am. We can use cell sites.
Q. Okay. So is there a way for you to verify and validate the accuracy of the cell site locations that are listed in the

CDRs?
A. I can drive to the actual location of the tower and visualize the tower for the location that it's been provided.
Q. Is there a way to verify the locations of those towers and the identity of those towers outside of -- that are listed in the CDRs?
A. I think you are getting to the accuracy of the records themselves.
Q. Yes.
A. Number one, I think telephone companies -- Verizon is a multibillion dollar company that relies upon these records not only for billing purposes but also for the health and welfare of their network and to maintain them.
Q. They don't rely on them for location -- locating cellphones, though, do they?
A. They do, ma'am.
Q. They do?
A. That's the reason they record the tower and sector information. For example, if they were to start receiving a lot of dropped calls in a certain area, they will begin to produce the records for various phones that may have been located in a certain area that they will analyze where those phones were located. And they will utilize that information to identify maybe where there's weaknesses or problems within their network in which they need to address.

Q. I'm not talking about a review of bulk material to determine whether or not there's accurate coverage or whether or not a hundred phones are being dropped. What I'm talking about is do they use those records to identify the specific locations within a sector of individual cellphones?
A. You used a lot of terms in your question, ma'am. Let me see if I can break that down. They utilize the records -- specifically if an individual calls 911 or if there is exigent circumstance, they will use those records to provide a general location for where a phone is located based on tower and sector use information.
Q. Well, 911 no longer uses tower sector use; isn't that right?
A. No, that's not right.
Q. There was too many mistakes.
A. That's incorrect, ma'am.
Q. Is there not an incident where a call from Philadelphia -- the company, based on the towers, directed the emergency personnel to some place in Burlington County, New Jersey?
A. I think that was in your filing. I think I read something about that. I can't speak specifically to what occurred there. I wasn't present. I don't know if that was a misinterpretation of the records. There's various steps in which you can identify the general location of a cellular device. The 911 PSAP system uses various layers within that

to get to an accuracy percentage which is required -- I believe it's regulated by one of the Government situations. So not always will they have the greatest precision, but the records are accurate if interpreted properly.
Q. Have there been any studies over the course of time of how often someone was sent -- an emergency vehicle was sent to the wrong place in the United States as a result of cell tower location information?
A. I'm not aware of a study that you're referring to.
Q. Is there any data showing the statistics of how often those kinds of errors occur?
A. I can speak from my experience in locating missing kids --
Q. I was asking for studies, data, peer reviewed published articles on the topic.
A. I believe there's peer reviewed articles. I believe there's cellular theory. I mean, a phone has to be within the cell footprint coverage of the tower and sector in order for a call to be carried. If it doesn't have cellphone coverage, it cannot place that phone call.
Q. But it also depends on the range of the particular tower, whether or not there were functioning towers closer; is that correct?
A. No, ma'am. It wouldn't matter whether there's functioning towers closer or not. If a phone carries a call off of a tower and a sector, for one, the tower and sector must be

valid, powered on, and it must be providing a usable signal or coverage to that device in order for that device to carry, irregardless of what the other towers in that area are capable of doing.

Q. With regard to the individual towers that you have identified, have you done an analysis of the range of those particular sectors on those towers?

A. I can generally look at how the infrastructure is designed and I can tell you, for example, just to use probably the most obvious one that I can give you is I can tell you at 11:25:56 p.m. on May 18th that the device ending in 7988 is by no means in East St. Louis or Troy, Illinois. In fact, it's in the South Shore Park neighborhood or area of Chicago. For example, there's no cell tower that will provide coverage from Chicago all the way down to East St. Louis.

Q. That wasn't my question. My question is what is the range of the individual towers that you have identified in your presentation?

A. So I can look at the infrastructure of the network.

Q. I'm asking if you drive tested the range, not look at the infrastructure. Because -- are you saying that because there are three towers in a particular area that that limits the range of each individual tower?

A. I haven't stated that, ma'am.

Q. Okay. So have you identified the range of the towers that

you have included here?
A. I can make a general estimate of that range from speaking with engineers on how they design their networks, where the other towers are located within that and understanding that obviously they're going to provide coverage in the Chicago area.
Q. So I guess the answer to my question is you don't have the particular information about each tower that you've identified; is that right?
A. I wouldn't say I have specific drive test information for the tower in 2018.
Q. That's what I asked. That's what I asked. Now, the engineers working for the service providers that you conducted, designed those systems for the service providers purposes; is that right?
A. Yes, ma'am.
Q. They don't design them to locate cellphones for the purposes of law enforcement?
A. No. I mean, there's an overlap function there.
Q. The service providers use them for proof of service and to correct their coverage, right?
A. They use it for the health and welfare of their network, to identify weaknesses and make changes in their network. They have the 911 PSAP requirement to locate devices. So, yes, they use it to identify the general location of devices.

Q. Within individual sectors based on the range of specific cell towers?
A. I mean, very similar to the way that we're speaking now, they do it the exact same.
Q. The telephone companies do this precise function?
A. Yes. They can utilize the call detail records knowing where their towers are located and identify general location for a device based on that.
Q. They can do that. My question is do they do it on a regular basis?
A. Ma'am, when somebody calls on a 911 system or needs provided PSAP, they will provide out a tower and sector information. I imagine they have an automated process that quickly reviews the records of that call and provides that historical information out.
Q. But 911 uses primarily GPS location services; isn't that right?
A. I believe the goal of 911 would be to be as precise as possible. And again, we spoke about this. There is a percentage in which they're regulated to be -- to provide that accuracy. They all have various levels. One of which is this exact same thing. Sometimes they can only provide a tower. Sometimes they provide a tower and sector. Sometimes they provide additional information which they use algorithms in an assistance mode to provide an even more precise location. It

doesn't mean that it's more accurate because they're using algorithms to try to decide what is more precise, but, yes, they're providing a tower and sector in many cases.

Q. If a service provider made an error in identifying the cell site phone -- the cell site that a phone connects to, would you know that?

A. I think looking at the amount of records that we are here I would be able to tell you if there would be an erroneous error that would throw it far. For example, if you look at the routes going back and forth from East St. Louis to Chicago, I would not expect to see a tower that would show up in Iowa or Indiana or even a city over or quite honestly using the drive route times, I would not expect to see it off the drive route because there wouldn't be a time between those other transactions to be valid.

Q. Are you aware of studies on how often a cellphone connects to a site that is not the one that is the closest to a location, to a tower?

A. I'm not aware of a study in that regards.

Q. Are there any proven rates of this happening?

A. I'm not aware of a study that would indicate not the closest tower.

Q. Now, the individual sites have different signal strengths but that's controlled by the companies; is that right?

A. The engineers, yes, ma'am.

Q. The engineers in the companies control the signal strength and it varies from tower to tower; is that right?
A. Yeah. I mean the engineers are configuring their tower, yes.
Q. So the strength of the -- the strength of the signal depends on the demand for the coverage in the particular area; is that right?
A. No. The demand for coverage -- there's a large number of factors that you would utilize in order to provide the amount of coverage that you wanted for a certain area. The bandwidth and the actual backhaul and the amount of other resources made available to that tower would actually control capacity so I think maybe you're misusing a term.
Q. Are strength of signal, bandwidth different?
A. Yes, they are different.
Q. But all of this -- and I think you testified before that it can all be impacted by the topography of the area like buildings, hills, foliage, things like that; is that right?
A. Yes, that can effect coverage.
Q. And you visited each and every cell site on this map?
A. I have visited each one that was utilized.
Q. And each cell site and that is in those records that you say you'll be able to provide us; is that true?
A. The visual viewing of those would not necessarily be observant in those records.

Q. Did you take notes?
A. No.
Q. Do you know the signal strength and the bandwidth of each of the cell sites on your maps?
A. No, ma'am.
Q. Do you know the precise coverage area of each of the cell sites on your maps?
A. No.
Q. Is that information available to you?
A. The precise?
Q. Yes.
A. I would make it available to you if I had it currently.
Q. I said is it available?
A. I don't have it.
Q. Can you tell by looking at a site what its signal strength is?
A. Visually looking at a site?
Q. Well, I wouldn't think it would be auditorily looking at it, but visually, yes.
A. I can use a cellphone in engineering mode or one of our receivers, but visually looking at a site, no, I cannot see radio frequency and determine a signal strength.
Q. Do you know how often the companies drive test these sites?
A. I believe they have crews and contracts that they utilize

in various areas at different times. I don't know specifically how many. I think it would be when they need it.
Q. Now, when you observed these particular sites, did you actually test for the signal strength and the coverage area?
A. Some of these I did, yes.
Q. Okay. Can you -- and those will be in the materials that you can provide us with?
A. Yes, ma'am.
Q. What is the maximum range of any particular cell site?
A. That depends.
Q. Maximum? Maximum range of any particular cell site?
A. Are we talking a macrocell, microcell, picocell, nanocell?
Q. I'm talking about the cell sites you're talking about here.
A. The maximum range depending on where they're located and how they're configured, I'm sure they could be five miles or more if they were in a rural area.
Q. Well, the capability of the particular equipment is not affected by the nature of the area that they're in. It's the settings that the company gives it; is that right?
A. Yeah. That's correct. I don't -- I mean, if you're providing overlap coverage in multiple areas and trying to shoot a tower very far across over the towers, number one, you're going to create interference and degrade your network's capabilities. Number two, you're going to be wasting a lot of

money and most engineers probably wouldn't be retained.
Q. That's your -- that's from your direct experience with this technology?
A. Yes, ma'am. This is from doing numerous drive tests. This is also from speaking with engineers, specifically with Verizon engineers, on how they designed and the type of requirements and the goals and objectives that they have in designing their network to provide coverage to people throughout the United States.
Q. Are the company drive test figures available?
A. I imagine they -- I guess if you subpoenaed them, I guess you can probably receive them, Ms. Barrett.
Q. But you don't have them available to you?
A. I do not.
MR. BARRETT: Mr. Franker, can you share your screen so we can put up --
MR. FRANKER: Yes, sure.
BY MS. BARRETT:
Q. And for this purpose, I wanted to start out at page three. I believe you testified that most of the towers or cell sites that you tested or that were irrelevant to this case were three sectors; is that correct?
A. Yes, ma'am.
Q. And were all of those sectors on towers or were some on sides of buildings; do you recall?

A. Some were on buildings, yes, ma'am.

Q. And for the sites plotted on the map, can you identify which ones were ones that were on buildings and which ones were on towers?

A. That would take a considerable amount of work, but, yeah, we can go through and look at Google Earth and verify which ones are where.

Q. And do they -- how many of them actually appear as this illustration shows us?

A. Can you be more specific? These are drawings. These aren't like pictures of towers.

Q. I understand they're drawings. I am just saying I wanted to know whether or not this particular drawing was representative of the towers that we're talking about that you have identified that these phones connected with.

A. They're representative of a three sector tower, ma'am.

Q. So the point of the drawing is the sectors, not necessarily that tower part; is that right?

A. No. This just orients the reader of the report that -- it helps explain to the prosecution, the defense, the jury, your Honor in regards to how towers are sectorized and why companies do that. I mean, obviously their sectors aren't red, green and yellow. It helps in the explanation.

Q. Right. In the illustration of the sectors, you note each cell site orientation can vary at the top and that this is for

an example only, right?
A. Correct, yes.
Q. And in reality, the coverage area of the tower sectors never looks like a pie divided into three equal slices; isn't that true?
A. The sectors, you know, if they're using three sectors, they're going to be 120 degrees. I think you're getting at the fact that they're not defined like specifically with the outer edges?
Q. Yeah. They don't look like that.
A. That's correct. There's not an outer edge and that's why on the maps we use the open wedges.
Q. And this one doesn't show overlap; is that right?
A. No, I don't have multiple towers here to demonstrate overlap.
Q. Or overlap of sectors?
A. I did not demonstrate that here.
Q. And the boundaries between the sectors are never straight lines; is that true?
A. That's generally true, ma'am.
Q. So a phone which uses sector two could be outside of that area that you identify as sector two?
A. Yes. Again, I wasn't using this to illustrate that point.
Q. And it could be over the line in the pink or the green area or outside the circumference of the circle; is that true?

A. Yes, ma'am. This is not used for that purpose.
Q. And what purpose -- what is the purpose then?
A. The purpose -- I'm sorry. Go ahead.
Q. What is the purpose for having this in your report?
A. You know, if this ends up at a trial before a jury, typically jury members don't have the knowledge of cell networks and how they're created and designed. And so this slide is used to begin to demonstrate and explain to them the objects that they were seeing constructed in the air that may hold these antennas are actually cell towers and then to give them an example of from my cell tower the fact that they're actually sectorized or cut into different pieces. And so that's why I gave the hot air balloon of being in the air and looking down and you would see these various sectors if you could actually see the RF. And then explain why when we get to the tower list why we would see the tower and then a sector and then we would also see the azimuth or orientation. This is generally used to begin to explain how towers are sectorized.
Q. To be clear, no tower sectors look like this?
A. No, they're not green, yellow.
Q. No. And they're not divided by straight lines and they don't have a perfect circle to outline them. Most of the sectors look like blobs or a map of New Jersey; isn't that right?

A. I wouldn't say they look like New Jersey, ma'am, no.
Q. But they look like blobs or amebas? Some people have described them looking like amebas, but they don't look like pies; is that true? I understand you're using it for illustration, but my concern is whether or not the illustration itself simplifies the process so much that it misleads. We can move on. Let's go to page four.
THE COURT: Ms. Barrett, I'm going to interrupt you. We've been about two and a half hours. It's probably a good time for a break. What I'll do -- let's take a ten-minute break. It's 35 minutes after the hour, so let's start up again at ten minutes before the hour. And I'm told everybody is to leave their video on, just mute themselves, and then certainly do not leave the Zoom, obviously, as you'll have to reconnect. All right. We'll see you back here in a little bit. Thank you.
(Recess taken.)
MS. BARRETT: I think I was asking Mr. Franker to put up page four.
BY MS. BARRETT:
Q. Okay. So Mr. Katey, this shows the symbol that is used for each cell site the phone is connected with. That's correct, right?
A. Correct. Each cell site and sector, yes, ma'am.
Q. But this is not a fair and accurate representation of the

coverage area or the range of the signal of the individual sites; is it?

A. The half circle?

Q. The entire illustration.

A. That's not what it's being used for, no, ma'am.

Q. And you actually say so on the bottom of the page. And you say that it's used for the direction the sector's antennas on the cell tower are oriented, not to show the range or the coverage area; is that right?

A. Correct.

Q. What does the shaded area add to that?

A. That tells you which side of the lines that we're speaking towards or talking towards. That is the side of the lines in which the energy or the RFs are being projected away from the tower.

Q. How does it add to the V shape?

A. Again, it would indicate that the sector that is being referred to is the inside of that V shape, not the obtuse or the outside of the shape.

Q. Is there any reason why it's that particular distance from the tower? In other words, wouldn't it be more representational if it were a big -- go from the end point to the end point in a semicircle way?

A. It is funny that you would ask that question, ma'am, because I believe if I put it on the end point you'd be

arguing that would be a closed wedge, and then I would be suggesting that that was the coverage area. The reason it's put as close as possible to the tower and it is described there, it doesn't provide the coverage area. It just indicating which side of the lines we're referring to.

Q. And that couldn't be done by just using a laser pointer?

A. I couldn't use a laser pointer currently, no, ma'am.

Q. Well, not today. I mean in terms of illustration.

A. Many courtrooms today have monitors directly in front of the jury, which I can't do laser pointers for each one of their monitors.

Q. You can draw on them.

A. Courtrooms are using TVs these days and the laser pointers don't work well on TV screens.

Q. Well, be that as it may, the only thing that that is supposed to demonstrate is that that is the direction that the cell tower pointing; is that right?

A. That's correct.

Q. And not an estimated representation since an illustration of the coverage area and the range would appear very different; is that right?

A. It's not an illustrative of a minimum or maximum coverage area.

Q. Are you familiar with the terms backlobing and sidelobing?

A. Yes, ma'am.

Q. And could you explain what they are?
A. Yes. So at times when a tower projects energy, there's oftentimes areas in which it may bleed.
(Interruption.)
Q. That wasn't me.
A. So oftentimes in the design of antennas, be it Yagi or whatever else, there's oftentimes they bleed or RF isn't -- RF has, as you explained earlier, an ameba shape. Backlobing is oftentimes when there's a little bit of energy, for example, around the tower, maybe specifically at the base of the tower.
Q. And a person could be standing on the opposite side of the area that you illustrated here where there's backlobing; is that right?
A. There could be backlobing, yes.
Q. So that person would not necessarily have to be within the sector as shown on the screen?
A. It's within the cell footprint. If you are asking me specifically within this half circle, the answer is no.
Q. But it could be on the block behind the tower? If the tower is facing north, it could be on the south side of the tower if it were backlobing.
A. Did you say a block? Is that what you used, the term used? A block?
Q. The block behind, meaning somebody could be standing to the south of the tower and if backlobing were occurring --

A. Backlobing is not going to be substantial. Backlobing is going to be just a -- they're going to try to minimize that as much as possible because that's going be interference in another sector. In theory, there is backlobing and it would be minimally around the tower.
Q. Are you familiar with data about how often that occurs at cell sites?
A. Are you referring to a specific research project or something? I'm sorry, ma'am. Could you expound upon your question?
Q. Is there any published material regarding how often backlobing or sidelobing occurs around a cell site?
A. I think that's a -- that's an engineering design result of RF coming out of an antenna. That's just the way antennas act. You could pull specific antenna specifics and see that, so I don't know if there's studies or research projects that you're referring to.
Q. Yes. That was my question, but we don't know how often that occurs and we don't know the actual perimeter of each individual sector and we don't know the range of the cell towers; is that right?
A. We can make a general --
Q. I'm not asking for a guess, sir. I'm asking if you know the facts.
A. I guess I know the facts that were presented to me, yes,

ma'am.

MS. BARRETT: I have nothing further, your Honor.

THE COURT: Ms. Freter, do you have anything that you want to add by way of cross-exam?

MS. FRETER: I do, your Honor. Dana, can I share screen, can you give me that ability?

COURTROOM DEPUTY: Yeah, you can.

MS. FRETER: Thanks.

CROSS-EXAMINATION BY MS. FRETER:

Q. Can you describe for the Court what computerized switching service is?

A. Computerized switching services, are you referring to the network where a mobile switching center receives calls?

Q. Yes. Yes.

A. Yes, I can.

Q. Please do so.

A. When a telephone makes a phone call, the phone call is carried on antennas that are mounted on a tower often referred to as a base station controller or transceiver. There's digital equipment at the base of that computer that would then send it back to the mobile switching center. These mobile switching centers are located throughout the area. They're designed very similar as data centers. They house databases such as HLRs, VLRs, home location registry databases. They also have authentication servers to verify that the phone is

allowed to be on a network, and they also have data and recordkeeping databases for these transaction type records.
Q. Does T-Mobile use switching service?
A. T-Mobile uses switches, yes, ma'am.
Q. Did they use them in 2018?
A. Yes. They would have used digital mobile switches, yes, ma'am.
Q. And those digital mobile switches will route sometimes a cell call to a cell tower; is that correct?
A. Correct.
Q. In 2018, in Chicago, was T-Mobile using digital switching services?
A. They used mobile switches, yes.
Q. Any used on the calls in this case?
A. Every single call would have had to have been switched through a mobile switching center.
Q. So the call is placed in 2018 in Chicago on 72nd Street and it goes to a switching service that routes it to a T-Mobile cell site; is that right?
A. For an incoming call for a device that is T-Mobile, I believe your description is correct.
Q. It's not that the phone is connecting to a cell site. It's the phone is connecting through a switching service to a cell site; is that correct?
A. No, that's incorrect. Actually, the phone is

communicating directly with the cell site. The cell site is connecting to the switching service.
Q. And it's the switching service that decides where the call goes; is that right?
A. You can think of it as the brains behind it, yes. So for example --
Q. No. Sorry. I don't have a question so hang on with me, okay? So the cellphone tower log that you used, do you have a copy of that?
A. I believe it is probably in discovery or was received with the records.
Q. Do you have a copy of it where you're sitting today?
A. I do not have a copy in front of me, no.
Q. When did you request the cellphone tower log? This is the thing that says where the cell towers are, right?
A. Yes, ma'am.
Q. Okay. When did you request that?
A. I would probably pull that down when I begin to analyze the records.
Q. And when was that?
A. I received the request in this case on August 4th of 2020.
Q. And you pulled the cell tower records in or about August of 2020; is that right?
A. That would be approximately correct, yes, ma'am.
Q. The cell tower record that you received, what date was it

for the cell towers for?
A. I would have to look at those records.
Q. Which you don't have; is that right?
A. If you can present those to me --
Q. I don't appear to have them either, but you don't have them; is that right?
A. I do not have them in front of me, no.
Q. Do you know if they were for the 2020 cellphone tower sites or the 2018 cellphone tower sites?
A. They would have been for the time of the event.
Q. Which was 2018; is that right?
A. Yes.
Q. Did you get the 2020 ones?
A. I'm sure I've had them. I'm sure that I've looked at them in a case, but I don't know if I had them for this specific case.
Q. Did you get the 2017 ones?
A. For this specific case?
Q. Yes, sir.
A. I don't believe so.
Q. The only cellphone tower record logs that you looked at were for 2018; is that right?
A. I probably would have looked at the cell tower records for the period of which the incident occurred, yes.
Q. And that was 2018?

A. Yes.

Q. When did T-Mobile -- you don't have any information about when T-Mobile changed where its cell sites were located between 2017 and 2018; is that right?

A. I probably have those records, yes.

Q. Did you review them in preparation for this case?

A. I've probably reviewed records in towers. I don't if I did specifically for this case.

Q. So you're not sure whether or not you look at the differences between the 2017 cell towers and the 2018 cell towers; is that right?

A. I don't recall, no, ma'am.

Q. And you don't recall whether you looked at the difference between the 2018 records and the 2019 records; is that right?

A. That's correct.

Q. And you did not compare the 2018 records to the 2022 records; is that right?

A. I've probably looked at the comparison of those two because the drive test occurred most recently in October or November of 2022 so I would have looked at a tower list at that time.

Q. And so you have a recollection that you compared the 2018 tower list to the 2022 tower list?

A. I would have been comparing where the locations of the towers were that were analyzed in this case to where the

towers were located in the list and where they're physically located in 2022.

Q. Let's try again. You have a recollection of comparing the 2018 cell tower records to the 2022 cell tower records; is that right?

A. Not the actual lists. I think maybe that's where we're not speaking the same. I would have compared my report in conducting a drive test after leaving the airport. I would be looking at, okay, this is where this tower should be located, let's see if it is located there and then looking at the current tower list to see where that says it is located.

Q. Did you compare the 2022 list to the 2018 list?

A. I don't recall doing specifically that.

Q. Did you generate a 2022 list before you did your 2022 drive test?

A. I would have looked at that list, yes.

Q. You didn't print it off? You just reviewed it?

A. No, I would not have printed it off. It's voluminous.

Q. You didn't provide it to the US Attorney?

A. I did not.

Q. And it's your recollection that you provided them with the 2018 list?

A. I would have provided them with the records -- they provided me with records to analyze, so I would provide them back my report.

Q. Let's talk about this report, this 25-page report that we're talking about you generated in anticipation of litigation; is that right?
A. I was requested by FBI Springfield division to conduct the analysis, so it was probably -- I don't know what their purposes for requesting it. Obviously, because we're here now, it is being used as litigation.
Q. You generated your report as part of your investigation in this case, right?
A. That's correct.
Q. You didn't do it for fun on a weekend, right?
A. No.
Q. It was part of your job in this case to generate a report; is that correct?
A. Yes, ma'am.
Q. Had you not been asked by the US Attorneys to generate the report in this case, you would not have done so; is that correct?
A. That is correct.
Q. When you generate this report, it is a reflection of your opinion about the data that you looked at in this case; is that right?
A. Yes.
Q. And you do that in a combination of your eyeballing or reviewing by hand individual data, right?

A. Yes, ma'am.
Q. That would be the call logs, for example?
A. Yes.
Q. You look at those and you say, oh, I care about May the 18th of 2018, I'm going to use those calls, right?
A. Yes, based on a date and time and then provided and look at those records, yes.
Q. You make that decision yourself?
A. Yes.
Q. And then you input data you select into various computer programs in order to demonstrate these demonstrative maps; is that right?
A. Yes, they do assist.
Q. And you have the opportunity to change or alter how the maps appear; is that correct?
A. I can add icons, yes.
Q. You can zoom in?
A. Yes.
Q. You can zoom out?
A. Yes.
Q. And in this report, we have maps that are closer. So for example, I'm showing page 16, you can see little tiny streaks on that; is that right? Can you see the map on your screen?
A. No, it's your desktop now.
Q. Is it on it now?

A. It is. Can you make it full screen, if possible? Yes. I see that now.
Q. So you can see Ridge Street or Lancing Municipal Airport; is that correct?
A. Yes.
Q. And you were the person who decided how close up to make page 16 of the map?
A. Yes.
Q. And for page 17, you were the person that decided to make that zoomed out further away; is that correct?
A. Yes, ma'am.
Q. And going back to page 16 -- I'll go to page 18. Do you determine the length of these green vectors?
A. I do.
Q. So you were the person, not the computer, that decided it's going to go from this number one here right above the O in Jackson Park Highlands; is that correct?
A. That's correct. The computer will determine its determination, but I will look at that and make a determination.
Q. And so on page 16, you were the one that determined how long the lines should go coming down from this one at the top that is number two; is that right?
A. Yes.
Q. You decided to extend the green line all the way down into

Brownell Woods; is that right?
A. That's correct.
Q. You were also the one down here where it says Ford Heights to decide how long to extend those green lines?
A. That's correct.
Q. The cellphone records that you review only tell you which 1, 2 or 3 the call hit the cell site on; is that right?
A. It tells you the tower and the sector, yes, ma'am.
Q. The sector is that one, two, three?
A. Yes.
Q. So that one here right by Ford Heights representing the one sector; is that correct?
A. That one here, it's just tower reference so when we speak of a map I can tell the tower reference is the number one on the map.
Q. So this number one on the map does not correspond to your demonstrative sector number one; is that right?
A. That is correct.
Q. You're the person who inserted number one?
A. Yes. I mean I think it's probably easier -- if you look at slide 17, it's much easier to talk through the various six tower sectors that exist on a map if they had a reference rather than constantly going back to the actual cell ID name.
Q. You decided to add numbers one, two, three, four, five, six to this map?

A. Yes.
Q. And that's based on you creating a demonstrative report?
A. Yes, ma'am.
Q. That you feel it's easier to discuss things that way; is that right?
A. Yes.
Q. And while we're on page 17, you decided where to put this red marker; is that right?
A. The marker is corresponding to an address so the address -- I don't just drop it. It corresponds to a specific address on the map.
Q. But you told the computer to put a red marker at 7159 South Euclid, correct?
A. Correct.
Q. You decided to make it red?
A. That's correct.
Q. You also decided where to put this G at; is that correct?
A. Yes, ma'am.
Q. You also decided to have it use the letter G; is that correct?
A. Yes.
Q. On page 19, all of these little green dots are cell towers; is that right?
A. That is correct.
Q. And that's for T-Mobile?

A. Yes, ma'am.
Q. When you did your drive test -- and these green dots are also on page 18, cell towers for T-Mobile; is that right?
A. That is correct.
Q. Is that how it was in 2018, 2020 or 2022?
A. This is 2018.
Q. Do you know what changes have been made since 2018?
A. I imagine there's probably more towers, different frequencies.
Q. Do you know what changes have been made since 2018?
A. If somebody spent the time they can probably do a comparison.
Q. My question to you, sir, is do you know what changes have been made since 2018?
A. As we speak, I can't go through the list of the changes, no.
Q. On the range, on this number one here, do you know if it goes out six blocks?
A. Ma'am, I could tell you it generally covers the -- you're talking tower reference number one?
Q. Yes.
A. Cell ID 34252?
Q. Yes.
A. It covers a general footprint that is in the direction of southeast of that tower pointed towards the South Shore

neighborhood.
Q. When you say southeast of that tower, that's because it would be off position number two; is that right?
A. No, because that's the orientation of the antenna on the tower on tower reference one.
Q. Is it sector two?
A. In this case it's 120 degrees. T-Mobile identifies their cells by full name without a sector. But based on the degrees, I would assume that is sector two.
Q. So you don't know?
A. I could look at the tower list but -- it wouldn't be necessary. That sector faces 120 degrees, which is generally southeast.
Q. We'll go back to that in a second. This drawing on page three, sector one, two and three, that's not how T-Mobile names its sectors; is that what you're saying?
A. Correct.
Q. They use something totally different?
A. Depending on the technology, the answer is yes.
Q. Well, in this case?
A. Yeah. So if you look at page 18 you'll see various technologies in use. You'll see the cell ID 34252, that's a unique identifier for the actual cell and sector. And then if you look at reference two, you'll see where they are using different technology; 34081, sector one.

Q. And that is proprietary to T-Mobile?
A. No.
Q. Their naming system is unique to them?
A. They would uniquely identify their towers just as a town would have a ZIP code, a street address and an actual street number.
Q. Verizon would not call their tower the same thing?
A. It's numbers so they would probably have numbers, but they probably have a tower that is 34252.
Q. In order for you to determine 34081-11, which direction that was facing, you have to reference it to the cell tower locator data; is that right?
A. T-Mobile provides within their records tower identification within their call detail records. So it would have the GPS coordinates for the tower as well as the tower identifier as well as the sector information. It's unique. That's also found in their tower list.
Q. For you to create this number two at 34081-11, what did you look at?
A. I would have looked at the call detail records as well as the tower lists.
Q. And then you manually inputted that into the computer?
A. The records ingest and process that.
Q. And that gave you a directional locating of north; is that right?

A. Zero degrees, yes, ma'am. It would be north.
Q. Rather than a reference to a one, two or three?
A. So when you look at a tower list, you're going to have -- you're going to have the site ID. Depending on the technology you will have the sector ID. If it's -- that's LTE. If it's UMTS in this case, it's going to have a lack ID and it's going to have a cell ID. That cell ID is unique to the sector. So it's not necessarily going to have a one, two, three, but looking at the tower list, you would be able to identify is that sector one, sector two or sector three.
Q. So to go back on somebody else that is not T-Mobile, you get an identifier that says sector one; is that right?
A. You would get an identifier for the sector depending on the technology, yes, ma'am.
Q. And then you compare that to how does AT&T, Verizon, something, tell me that they have installed this particular cell site at sector one for them faces zero degrees north, right?
A. Yes.
Q. Okay. It could be that for them sector one faces 120 degrees southeast; is that right?
A. If they chose to install it that way, yes.
Q. Is there anything in the tower log that tells you how they chose to install it?
A. There's an azimuth or orientation. Like in the T-Mobile

records they will provide a tower azimuth.
Q. And if the cell site gets twisted around in the wind, right, that's not going to be reflected in their azimuth; is that right? It's going to be based on how they had it installed?
A. Yeah. I guess twisted around in the wind I would -- I've never seen that occur short of a hurricane or a large scale tornado.
Q. Well, instead of being firmly affixed to the building, it partially falls off and it's hanging there. The azimuth is going to be different than how it would be reflected in the cell tower chart; is that right?
A. Correct.
Q. T-Mobile does not do that, though; is that what you're saying? T-Mobile does not give you a one, two or three?
A. They do depending on the technology.
Q. In this case?
A. In this case, there's multiple types of technology in use. There is UMTS as well as LTE.
Q. And does it give you an azimuth?
A. It gives me an azimuth.
Q. And that is based on the time in which the cell site was installed?
A. That's at the time that they generate their records, that's the azimuth they're providing.

Q. For page 16 for number two, CID 5123, you don't know when the record for that azimuth was generated; do you?
A. Again, I don't have the tower list in front of me so I don't know the date of that tower list, but it would have been before the time period that covered May 18, 2018.
Q. And you did not go out in May of 2018 or any time in 2018 and make sure that this CID 5123 indeed faced slightly southwest?
A. No, I did not.
Q. And you didn't do that in 2020?
A. I did not.
Q. And you didn't do that in 2022?
A. In October or November of 2022, I was in that area of Glenwood, yes.
Q. For this CID 5123 in 2022, you went and insured that this azimuth for number two faces southwest?
A. I would have drove that area, yes, ma'am, and I didn't see anything that was abnormal.
Q. Did you hook a phone up -- how did you ensure that this CID 5123 faces southwest? How did you ensure that?
A. So I would have had a piece of equipment with me or receiver that is actually collecting the signals. So, for example, if you drive from Glenwood Dryer, from left to right along that street, it would be collecting those signals and you would be able to tell where the heart of that signal is or

the azimuth.
Q. And did you do that?
A. In October or November of 2022, I did drive each of these areas.
Q. Okay. So for CID 5123, you drove by it, is that right, in October or November of 2022?
A. Yes, I would have drove by that.
Q. I get a little concerned when you say "would have," did you drive by it or not?
A. I did.
Q. And you collected data?
A. I did.
Q. And then you compared that data to the records that you already had?
A. Yeah. I saw nothing abnormal from the data that I collected. Nothing changed my analysis.
Q. When did you review the data that you collected for CID 5123?
A. I probably would have been reviewing it either realtime or at night.
Q. And so Special Agent Katey, I don't want you to guess about probably. When did you review it?
A. So if I was in the area at the end of October or the first part of November, it would have been at the end of October or first part of November.

Q. Do you have a specific recollection of when you sat down to review this data?
A. Ma'am, I can look at my calendar again. I can tell you it was at the end because I missed my daughter's Halloween to fly back for a trial before Judge Dugan, so I tell you it was during that period.
Q. Did you generate a report?
A. No, I would not have generated a report.
Q. Did you take any pictures?
A. No, I did not take pictures.
Q. This CID 5123, what kind of thing is it located on?
A. It would most likely have been a tower.
Q. Do you have a specific recollection of what it's located on?
A. No. Because as I'm looking at these things, I'm looking at Google Earth to see what the view of that tower looks like on Google Earth and I'm present with the tower just to verify, yes, it is located where it's been mapped, it looks like a tower, as it should, and then I'm moving onto the next one.
Q. So no, you don't have a recollection?
A. I don't at this point.
Q. I'm going to go back to some of the things up here. This is page six. You were the person who decided how long to make these red lines; is that right?
A. That is correct.

Q. Again, on page eight, you were the one who decided how long to make these red lines; is that correct?
A. Yes, ma'am.
Q. You were the person who decided to extend this red line on CID 202435-3 all the way up into Brownell Woods; is that correct?
A. That is correct.
Q. But for Verizon, the only thing that you can say is that this sector points west; is that right?
A. That sector faces 270 degrees in a general west direction, yes, ma'am.
Q. You can't say that it extends out all the way here to Brownell Woods where this line ends; is that right?
A. I can say based on my experience and communication with engineers and how they design their networks, they're going to extend their coverage area approximately 70 percent to the next tower.
Q. Are you aware that cellphone tower companies determine for some areas that they want better coverage than for others?
A. Sure.
Q. Are you aware that cellphone companies frequently determine that they like more coverage in more affluent areas than less affluent areas?
A. Ma'am, I'm not aware of cellphone companies -- your Honor, I would request that that question -- I think it's

inflammatory and it's asking -- like, I'm not --

Q. You can either be aware or not aware, and I don't think you're in a position to object to my question. You are either aware of it or you're not aware of it.

THE COURT: Just a moment, Ms. Freter. I don't see it is inflammatory. It's a simple question. If you're aware, that's fine. If you are not aware, that's fine. I don't think she's accusing you of anything at all. If you can answer that question, let's do that, okay?

A. I'm not aware of their desire to provide to affluent versus poor areas. I don't know.

Q. Are you aware that cellphone companies want more coverage in areas where they have more subscribers?

A. Yes.

Q. When you did your drive through did you -- for this CID 202435-3, did you determine the range of that cell site going west?

A. I don't recall at this point, ma'am.

Q. Is it something that you can do where you say you're here at this 394 and Southland Center that you can say, yes, I get cellphone service here right now or no, I don't? Is that something that you have the capability to do?

A. Yes, I'm sorry. I don't know where you're referring to on the map.

Q. It's this 394 is this road here. Can you see where my

cursor is? Do you see where the G is?
A. Yes.
Q. Right here is 394?
A. Okay. Yes.
Q. Okay. You could drive here 394 and this crossroad is like Glenwood something Drive?
A. Sure.
Q. The words on the map say Southland Center Ho-Chunk Nation, right?
A. Yes.
Q. You can drive there and say yes, I get Verizon service or no, I don't?
A. Yes.
Q. You didn't do that in this case; is that right?
A. I did in October or November of 2022. I am not here to present that is the drive test for 2018. I would be able to tell you whether there was Verizon coverage in that area for the end of October or the beginning or November.
Q. You drove to 394 and Glenwood Lancing Road at this intersection and you tried to get Verizon cell service; is that correct?
A. I would imagine I drove there and collected signals at that location.
Q. When you say "you imagined," does that mean that you know or you guess?

A. I don't have the specific like what roads I drove in that area but that would have been a road as I look at it now that if I could have gotten there that I would have wanted to collect signals from that location. I presume, without looking at the drive test data for 2022, that I was present at that spot.
Q. This line, this red line that you drew, cell service may not go all the way up on Verizon in 2022 into this green space named Brownell Woods; is that right?
A. Based on my opinion and looking at the infrastructure that exists, that is my opinion that coverage would exist up in Brownell Woods.
Q. Okay. That's your opinion; is that correct?
A. That's correct.
Q. You did not specifically test it?
A. In 2018, I did not test it.
Q. How about in 2022?
A. I would have tested the area, yes.
Q. Up here in the 394 in this green space called Brownell Woods?
A. I would have traveled the roads. I don't know that I would have driven into the grass in that area, no. I would not have. I did not.
Q. On page ten, you were the person that decided that these lines would be shorter, the red lines where it says position

number two; is that right?
A. I'm sorry. Can you repeat your question?
Q. You were the person that decided that these red lines would be this length on position number two?
A. That's correct, on tower reference number two.
Q. And you were also the person on tower reference up here number one that decided that the red line would extend into this red marker; is that right?
A. I would have chosen the length, yes.
Q. And the length of the lines around number one are different than the length of the lines around number two?
A. Yes.
Q. And that's based on a decision that you made?
A. That's correct.
Q. The same thing would be true on page 12, the lines on number one are very long; is that right?
A. Yes.
Q. The lines on number two where D is are shorter?
A. That's correct.
Q. You determined the length of the lines?
A. Yes.
Q. This does not reflect signal strength?
A. No, there's no signal strength indicated.
Q. You can't tell how strong the signal is for one or two; is that right?

A. No, based on the map, no.
Q. You can only tell which direction and at what degree angle the section is; is that right?
A. I'm also making a determination of a general area of coverage that the phone generally would be located in.
Q. So it is your opinion that the signal strength for number one is greater than the signal strength for number two?
A. I don't believe that signal strength is the right term. I think coverage area. Signal strength doesn't always indicate coverage area. It could be the tilt or the degree of which the antenna is installed on a tower.
Q. It's your opinion that the coverage amount for number one is greater than the coverage amount for number two?
A. Yes, ma'am.
Q. And you represented your opinion than the coverage for number one is greater than the number two based on the length of these lines; is that right?
A. That does represent a larger coverage area, yes.
Q. In your opinion?
A. Yes, ma'am.
Q. Not based on data from Verizon?
A. It's based on speaking with engineers and how they develop their networks and the fact that there would be general overlap. They would have to design that in order to maintain a network without dropped calls.

Q. When did you speak with Verizon engineers?
A. Beginning in 2014, '15 and continuing through to 2022.
Q. When in 2020, when you created this report, did you speak with Verizon engineers?
A. I wouldn't speak with them specifically about this report.
Q. Well, you created the report in 2020; is that right?
A. That's correct.
Q. When in 2020 did you speak with Verizon engineers?
A. I usually speak with them at least once a year if not twice, two or three times a year.
Q. Do you know when you spoke with them in 2020?
A. I do not.
Q. Did you talk to them about their cell coverage in central Illinois in 2018?
A. I would generally speak with them about coverage depending on where the engineer is from, roll outs with the different types of technologies or if they were doing anything different with their designs.
Q. You did not speak with them about these particular cell sites and what their coverage was?
A. No, ma'am.
Q. And the same would be true for T-Mobile?
A. That's correct.
Q. You're asking them, hey, do you guys have any new products or changes?

A. Yeah. They're providing educational. They're explaining how they design their networks, the things that they consider when they're locating towers. They're also telling us about new technology, different generations of cellular equipment that is coming out.
Q. And based on that, you made a determination that the coverage area for point number one was bigger than point number two?
A. Yes, ma'am.
Q. Is there anywhere on this document that this represents your opinion?
A. I mean, it's a report that I generated.
Q. But is there anywhere on this document I can see that represents that it's your opinion that coverage area for one is bigger than coverage area two?
A. I think the demonstrative exhibit indicates that would be my opinion.
Q. And where is that located?
A. If you look at tower reference number one and you look at the sector size, it indicates that it's larger. Through your questions, I've indicated that. Number two --
Q. I'm going to stop you because I didn't understand what you said. If I look at what?
A. If you put slide 12 back on the screen, please. If you look at tower reference one, it has a larger sector

represented on the screen. That is indicative of it providing a larger coverage area.

Q. In your opinion?

A. Yes, ma'am.

Q. Does it say anywhere in this document that the length of these lines correlates to coverage area?

A. I don't think it specifically states that, no.

Q. And this down here, number two, this coverage area, how did you decide to make the lines this length?

A. If you look at the infrastructure that exists around it, you can make an educated map indicating what the potential general coverage area of that tower would be.

Q. And what is the infrastructure located around Troy, Illinois?

A. You have various other towers in a general area. They would design their networks to provide coverage, usually on average 70 percent to the next tower.

Q. Do you know if that 70 percent is true for this tower?

A. No, ma'am.

Q. And do you know what this number two is located on? What the cell site is located on?

A. Near Troy, Illinois, I do recall several of them being located on water towers.

Q. What about this CID 214414-3/33?

A. That's what I'm referring to. I'd have to look to see

specifically.
Q. And again, this is by 2018, right?
A. Yes. This is 2018.
Q. It may or may not be in the same spot when you drove through in 2022?
A. Yeah. That's potential. I worked the East St. Louis during this time so I'd have other cases and other -- I'm not aware of any drastic changes in the Troy, Illinois, area that would have involved that tower between that time.
Q. You said it was a water tower; is that right?
A. I said in the Troy area they do have towers located on water towers. I don't know if this specific one does right now. I don't recall.
Q. What mathematical formulas, algorithms, computations did you use in order to determine the length of these lines for coverage area?
A. It would be my understanding with working with the engineers how they design their network.
Q. Working with engineers generally?
A. Yeah.
Q. What is the difference between the Verizon engineers and the T-Mobile engineers?
A. They work for different companies.
Q. What is the difference in how they design their networks?
A. Verizon has a CMA LTE infrastructure that they design off

of. T-Mobile has different technology, UMTS. They used to have GSM. They also have LTE.
Q. When did they make the switch from GSM?
A. Gradually over the last several years.
Q. Was there GSM in 2018?
A. There was no GSM used in this case.
Q. Again, on page 14, you decided how long to make the red lines; is that right?
A. That is correct.
Q. And you decided how to zoom in; is that right?
A. Yes, ma'am.
Q. And that's based on your opinion?
A. It's based on my opinion formed from my experience, my knowledge and the training that I received.
Q. You talked about how mountains or other big objects can affect which sector the cellphone is routed to; is that right?
A. The coverage area.
Q. Okay. Would it affect which sector the cellphone went to if there was a mountain?
A. The phone is going to choose the cleanest, clearest and strongest signal and it's going to choose that sector.
Q. Well, with aid from the switching service, right?
A. No.
Q. And if we're going to assume for a hypothetical that the cellphone was located where this G was, can we assume that?

A. If you would like, yes, ma'am.

Q. Okay. The closest cell site to that is not where this number one is; is that correct?

A. That is correct.

Q. In fact, there appears to be at least two closer sites; is that right?

A. Yes, ma'am.

Q. Are you the person who plots these with aid from the computer? You take in what is on the cell tower thing and you put in the coordinates? How is this green dot here plotted?

A. It's plotted based on the tower list.

Q. And you hand input that?

A. It's an automated process. It takes a spreadsheet with latitudes, longitudes.

Q. And so, again, hypothetically if there's a cellphone located at this G location at -- the same cellphone at 7:57 and 7:59, it could hit tower one at 7:57 and then hit tower number two up here at 7:59 without having moved; is that correct?

A. Based on the data I couldn't suggest that the phone moved or not.

Q. And neither one of these, this one that is over here by Glenwood or this one by this green dot would be the closest to this G; is that right?

A. I'm sorry. Can you --

Q. Yeah. That was a bad question. For our hypothetical the cellphone is at location G, right?
A. Yeah.
Q. You testified that the cellphone goes to the clearest tower; is that right?
A. It selects the tower and sector with the clearest and cleanest and strongest signal, yes.
Q. And in this case it was neither of the closest if it was at location G; is that right?
A. That's correct.
Q. And if the cellphone didn't move between 7:57 and 7:59, it hit off two different towers; is that right?
A. Yes, ma'am.
Q. That's possible?
A. Yeah.
Q. So clearest isn't necessarily closest?
A. Correct.
MS. FRETER: I don't have anything further.
THE COURT: All right. Mr. Franker?
MR. FRANKER: No further questions for Special Agent Katey. Thank you, your Honor.
THE COURT: I didn't mean to overlook you, Mr. Bruns. I didn't know if you were participating in this at all. Did you want any further cross-examination for your side? I know Ms. Freter did a good job, but --

MR. BRUNS: No, Judge. One lawyer per side per witness.

THE COURT: All right. I appreciate that. I think I have everyone's arguments. But if you feel compelled that you want to do some sort of statement after this today, that's fine. I'll be happy to listen to it, but I think I have the general ideas from the briefings and so forth, but I always hate to cut anybody off.

Mr. Franker, is there anything that you want to add?

MR. FRANKER: Nothing further for the Government. We've made arguments, both oral arguments as well on the briefing, and we will rely on those. Thank you.

THE COURT: Ms. Freter, anything further?

MS. FRETER: No, your Honor.

THE COURT: Ms. Barrett, I'll ask you the same question, but while you're thinking about that, I had a note here during the hearings the last time we were together on this subject, you had mentioned a Judge Rakoff I think is out of the Southern District of New York and you had mentioned a case where you thought he ruled in a way that you're asking me to rule. My good smart law clerks went on a search, the only thing we were able to find is a Sydney Scales case and a US versus Ray case, but neither of those seem to go to that level that you were indicated that Judge Rakoff went. Can you give us some direction where we can find that particular case?

MS. BARRETT: Yes, your Honor, of course. The case is called the United States versus Nieves is my recollection, but I'm going to look it up. I can e-mail.

THE COURT: E-mail everybody with it. I didn't want to overlook that case, obviously. Is there anything that you want to add beyond that?

MS. BARRETT: No, sir.

THE COURT: All right. I'm going to look at this and we will get you an order, a very short order because I know it matters a lot in this case. We're getting very, very close to trial. But since we are all here together, is there anything else we need to address while we're all here together?

MR. FRANKER: Nothing from the Government, your Honor. Thank you.

THE COURT: Ms. Freter or Ms. Barrett?

MS. BARRETT: No, your Honor.

MS. FRETER: I don't think so, Judge.

THE COURT: We'll adjourn. Have a good weekend.

(The hearing was concluded at 12:55 p.m.)

REPORTER'S CERTIFICATE

* * * * * * *

I, Erikia T. Schuster, RPR, Official Court Reporter for the U.S. District Court, Southern District of Illinois, do hereby certify that I reported with mechanical stenography the

proceedings; and that the same is a full, true, correct and complete transcript from the record of proceedings in the above-entitled matter.

*/S/ Erikia T. Schuster* 12/16/2022
IL CSR, RPR